672 So.2d 116 (1996)
STATE of Louisiana
v.
Willie Lee TART.
No. 93-KA-0772.
Supreme Court of Louisiana.
February 9, 1996.
Dissenting Opinion May 1, 1996.
Rehearing Denied May 10, 1996.
*119 Nicholas J. Trenticosta, New Orleans, Denise LeBoeuf, New Orleans, Ruth E. Friedman, Atlanta, GA, for Applicant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Earl Cox, Monroe, for Respondent.
Dissenting Opinion by Justice Johnson May 1, 1996.
WATSON, Justice.[1]
Willie Lee Tart was indicted for two counts of first degree murder of William and Lillian Quenan, an elderly couple murdered in their home in Bastrop, Louisiana, in violation of LSA-R.S. 14:30. After trial by jury, the defendant was found guilty as charged and unanimously sentenced to death after two aggravating circumstances were found. This is the direct appeal of his convictions and sentence. La. Const. art. 5, § 5(D); La. C.Cr.P. art. 912.1.
On appeal, Tart relies upon thirty-two (32) assignments of error for the reversal of his conviction and sentence. Four arguments involving eight assignments of error will be discussed in this opinion; all other assignments of error will be addressed in an appendix. Finding no reversible error in either the guilt or penalty portion of Tart's trial, we affirm the convictions and sentence of death.[2]

FACTS
At about 7:30 a.m. on September 7, 1989, the bodies of 70-year old William Quenan and his 66-year old wife, Lillian, were discovered by neighbors in their Bastrop, Louisiana home. The Quenans, owners of a local jewelry store, both died of multiple cutting and stabbing wounds. There was evidence that both had been bound. One of Mr. Quenan's wrists was still bound with telephone cord. One of Mrs. Quenan's wrists was bound with part of a broken belt; the remaining part of the belt was found on the floor under her body. Mr. Quenan's wallet and its contents were strewn on the bedroom floor; jewelry from several cases was spread on a dresser.
*120 The crime scene showed a prolonged struggle between the Quenans and their assailant. Blood was spattered around the bedroom, on the walls and in the adjoining hall. A portable phone and phone book opened to the emergency number page were bloody. Large pools of blood were visible on the carpet where the Quenans' bodies came to rest, as well as another pool on the opposite side of the bed.
Autopsy reports showed Mrs. Quenan was stabbed 21 times in her head, neck, chest and abdomen. She had defensive wounds in the form of bruises on her hands and wrists and cuts on both hands where she had grasped a sharp object. Mr. Quenan was stabbed 14 times, including a deep stab wound to his shoulder which cut a major artery. The Quenans' carotid arteries and jugular veins were cut, as well as their larynxes, which would have prevented them from screaming. The coroner determined the assault lasted at least 15 to 30 minutes. Based on information received in their investigation, the police believed the crime occurred before midnight on September 6, 1989.
The Quenan's GMC van was missing. The theft of the van, the disarray of jewelry on the dresser and the scattered wallet contents on the floor suggested that burglary and theft were the motives for the murder. The police discovered an auto radar detector on top of the Quenan's garbage can in their backyard. Investigation showed this item had been stolen from a vehicle belonging to the Quenans' next door neighbor, Dr. Baker.
While the investigation continued on Thursday, September 7, 1989, police obtained information that Willie Lee Tart had been in possession of several items of jewelry the evening of September 6, 1989. Sgt. Sherman Burrell of the Bastrop Police Department picked up Tart shortly after noon for questioning. Sgt. Burrell advised Tart of his rights at 1:30 p.m. and had him sign a waiver form indicating he understood his rights. Another waiver form was signed by Tart at 3 p.m., signifying he was again advised of his rights by Sgt. Burrell and Sgt. Freeman, who was in charge of the Quenan investigation.
Tart was wearing a LSU graduation ring with the initials "COB". He gave conflicting stories to how he obtained the ring, prompting further investigation. The police determined the ring belonged to C.O. Berry. This ring and other jewelry were stolen in a burglary of the Berry residence several weeks earlier.
At 3:21 p.m., Tart gave police a limited permission to search his bedroom. Tart's stepmother, Irma Peoples, also consented to the police search when officers arrived. Police found a small black purse which had various pieces of jewelry in it. A large watch with a white face was also seized from on top of a speaker. At about 4 p.m. Tart was arrested for possession of stolen property. He was placed in a juvenile detention cell because minimum security cells were full.
Anita Robertson came to the police department and identified the white watch as her property, as well as one of the rings found in the black purse. She had earlier reported the burglary of her house to the police. Robertson told police she had spoken to Lillian Quenan on the afternoon of September 6, 1989, and that Mrs. Quenan told Robertson that she was missing jewelry and suspected one of the yard men. Robertson, Berry and the Quenans employed Cleveland Holmes for yard work; in September of 1989, Willie Lee Tart had worked for Holmes three to five months. Holmes and Tart had worked at the Quenan house September 5, 1989. For about an hour to an hour and a half, Tart had been working unsupervised on the opposite side of the house from Holmes.
The Quenans' van was discovered earlier in the day stuck in a ditch several miles from the Quenans' home and was processed for evidence. No fingerprints were discovered, but a reddish smear was preserved for testing. A person recalled seeing the van being driven in the area with the headlights off near 2 a.m. on September 7, 1989. Although Tart was considered a suspect in the Quenan homicides by some officers, the location of the abandoned van gave the police additional suspects. Later that evening, police spoke to Tart's girlfriend, Cyrentheria Jackson. Jackson gave police a high school graduation ring which was later determined to belong to *121 C.O. Berry. She also gave police a necklace, rings and watch which Tart had given her. At this point, none of the recovered jewelry linked Tart to the Quenan homicides.
On Sunday, September 10, 1989, Tart was allowed to visit with family. On either Sunday or Monday, Tart was moved to a maximum security area and placed in one of two cells. The other maximum security cell was occupied by another prisoner, Shelby Sneed.
On Monday, September 11, 1989, Tart was taken before a judge for his 72-hour hearing on the possession of stolen property charge. A $5000 bond was set; no attorney was appointed to represent him at that time. Also that day, Willie Jean Mason turned in two rings to police which she found on her son's dresser. Her son, Ruffin Mason, told police he received the rings from Tart's 15-year old half-brother, Kendale Leonard, on Sunday, September 10, 1989.
Later on September 11, 1989, police went to Tart's house to speak to Kendale Leonard. Leonard gave police a black purse he retrieved from beneath Tart's mattress and saw that it contained jewelry when the police opened it in his presence at the station a little later. While Kendale was at the station, officers attempted to question Tart about the jewelry turned in to police. Sgt. Freeman and Sgt. Burrell advised Tart of his rights. In an oral statement, Tart admitted that he stole jewelry from various houses while doing yard work with Holmes. He specifically admitted he had burglarized the Berry, Robertson and Quenan homes. He stated he stole jewelry from the Quenans prior to the murders but was unsure of the date. The officers had Tart sign a waiver of rights form. They then tried to take a recorded statement, during which Tart invoked his right to counsel. The officers ceased questioning and Tart was arrested for three counts of burglary.
Later that evening, Sgt. Freeman and State Trooper Robert Buckley obtained a statement from Kendale Leonard. Leonard told the officers that Tart asked him during visiting on Sunday, September 10, 1989, to take the black purse and hide it away from the house. Leonard had not complied with this request but gave the black purse to police earlier in the evening. Leonard told police Tart had left the house on the evening of September 6, 1989, with a knife. Leonard also related he found reddish or rust-colored spots on the clothes Tart had worn that night. Leonard washed the clothes and used bleach and cleanser to remove the stains. Leonard told police Tart had admitted to robbing houses, including the Quenans'. Jewelry in the black bag was later identified as belonging to the Quenans.
Shelby Sneed, Tart's cellmate, had been arrested September 9, 1989. Sneed had previously been an informant for the Bastrop Police Department. On two prior occasions, he was paid for his information. He had worked for Sgt. Burrell at his house in the past and had a friendly relationship with the officer. In his conversations with Tart, Sneed came to know that Tart had a brother who lived near the area where the Quenans' van was abandoned. On September 13, 1989, Sneed provided that information to Sgt. Burrell. Sneed told officers more information he learned from Tart but officers told Sneed that they already knew the information.
Later in the day on September 13, 1989, Tart confessed to Sneed that he had committed the Quenan homicides. Sneed suggested that Tart talk to the investigating officers and Tart agreed he wanted to make a statement. Sneed contacted the police officer who was acting as jailer, and Sgt. Freeman and Trooper Buckley were summoned. Tart was interviewed by the officers after they determined he wanted to talk to them and after they advised Tart of his rights. Tart requested that Sneed be present during the officers' questioning. Tart signed a waiver of rights form at 6:40 p.m. and told the officers he murdered the Quenans.
The officers recorded Tart's statement and went over another waiver of rights form which Tart signed at 7:16 p.m. In the taped confession, Tart again admitted stealing jewelry from the Quenans when he was working at their house earlier with Holmes. When Tart was working unsupervised at the Quenan house that day, he had worked on the side of the house where the carport door was located. He had discovered that a glass *122 louver on the carport door was loose. The loose glass louver could be pushed aside, allowing a person to put their hand inside and unlock the door.
Tart stated he decided to return to steal more jewelry the next evening after he had been drinking. He burglarized two vehicles next door, stealing a radar detector from one and a hunting knife from the other. Tart entered the Quenan house through the carport door.
Once inside, Tart stated he opened the refrigerator to be able to see by its light. He removed his socks, shoes and shirt, placing the clothes behind a chair. Tart took a carton of milk and dropped it on the floor. He thought the noise would lure the Quenans out of their bedroom. He asserted he had planned to get into the bedroom, lock the door and take all the jewelry before leaving by the window. Tart dropped the milk and ran around a corner. He was in the Quenans' bedroom and was about to the lock the door, when Mr. and Mrs. Quenan came back in and discovered him.
Mr. Quenan had a vacuum cleaner pipe and began striking Tart. Tart stabbed at him with the hunting knife. Mrs. Quenan joined the fray and Tart began stabbing at her. During this scuffle, the Quenans were overpowered and fell to the floor. Tart bound Mr. Quenan's wrists with phone cord and tied Mrs. Quenan's wrists with a belt.
Tart picked up Mrs. Quenan with the intention of placing her and Mr. Quenan in the bathroom. However, Mr. Quenan freed one of his wrists and began attacking Tart again. The three of them scuffled; Tart remembered Mrs. Quenan grabbing the knife with her hands. Finally, Tart stabbed them until they were dead. He took the keys to the van from the dresser, left the room and retrieved his clothes.
Tart drove away from the Quenan house and stopped a little later to wash the blood off of him. He rode around trying to think what to do when the van got stuck in a ditch. He wiped the van interior to remove any fingerprints and walked home. He threw the van keys in some bushes and threw the knife in a business's trash can. Tart stated he washed his clothes the next day. Tart asserted he had not intended to kill the Quenans but they returned to the bedroom before he could lock the door. He stole no jewelry after the murders because he was too afraid and just wanted to leave the Quenan house.
After this confession, Tart was arrested for two counts of first degree murder. The next day, September 14, 1989, he was taken to court for a 72-hour hearing on the murder arrests and was referred to the Indigent Defender Board for appointment of counsel. Tart was indicted by a grand jury on September 21, 1989.
The police later determined from Dr. Baker that a hunting knife had been stolen from one of his vehicles. On September 14, 1989, Tart accompanied officers and showed them where he threw the van keys; they were bloody when recovered. Analysis showed Tart left a fingerprint in blood on the vacuum cleaner pipe. Tart also left a bloody footprint on a business card which had fallen out of Mr. Quenan's wallet onto the bedroom floor.
A change of venue was ordered when it was determined that a jury could not be selected from rural Morehouse Parish due to extensive publicity that occurred during the investigation of these murders of two well-known local residents. Trial began on November 12, 1991, in neighboring Ouachita Parish.
The state presented the physical evidence linking Tart to the crime, his footprint and his fingerprint in blood. Pictures and a videotape of the crime scene were presented, as well as the victims' autopsy photographs. Police officers testified to the course of the investigation. Shelby Sneed testified to the circumstances surrounding Tart's murder confession. Both Tart's murder confession and his confession to the earlier Quenan burglary were admitted in evidence. Kendale Leonard's statement was admitted. Ruffin Mason and his mother, Willie Jean Mason, testified that Ruffin had received jewelry linked to Tart. Cyrentheria Jackson testified Tart had given her several pieces of jewelry.
*123 Tart took the stand and admitted stealing jewelry from the Quenan home September 5, 1989. He denied ever returning to the Quenans' home and denied murdering them. Tart maintained he had been threatened and coerced into making his murder confession and asserted the police had told him what to say. Kendale Leonard also insisted he had been threatened and coerced by police into making his statement. The jury found Tart guilty of two counts of first degree murder.
During the penalty phase, the state presented evidence of Tart's involvement with the Berry and Robertson burglaries and his confessions to both. The state also presented evidence that Tart stole Uradell Savage's car keys and wrecked her new car by driving it over the headstones in the cemetery. Patty Quenan Kelly and her brother Gary Quenan testified what the murders of their parents meant to them.
Tart presented testimony of his former girlfriend's father and Cleveland Holmes, who both attested to Tart's helpfulness and respect. A former teacher and coach testified that Tart had had difficulties in school, been unable to spell but had been able to understand. This witness also testified to Tart's determination. Tart's older brother, James Leonard, testified about their childhood. Both boys were moved around a lot among various relatives. Although James was not too affected, Tart, younger and slower, had a more difficult time.
A unanimous jury determined that Tart be sentenced to death after finding two aggravating circumstances: 1) that Tart was engaged in the perpetration or attempted perpetration of aggravated burglary, armed robbery, first degree robbery or simple robbery; and 2) that Tart knowingly created a risk of death or great bodily harm to more than one person.

LAW AND DISCUSSION
I. Voir Dire of Vanessa Rice: Assignment of Error # 1
The defendant argues the trial court's removal for cause of prospective juror Vanessa Rice violated his right to an impartial jury, mandating reversal of his death sentence. Tart relies on Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam), and Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). The defendant asserts Davis, supra, announced per curiam that the erroneous exclusion for cause on Witherspoon[3] grounds of one prospective juror invalidated any subsequently imposed death penalty and that Gray reaffirmed that the improper Witherspoon exclusion of an otherwise qualified juror in a capital case was a violation of the defendant's Sixth and Fourteenth Amendment Due Process rights to an impartial jury.
Rice initially told the prosecutor she had "kind of mixed feelings" about the death penalty. When asked to explain her response, Rice stated the death penalty was imposed in some cases where it should not have been, and was not imposed in some cases where it should have been. As an example of a case where the death penalty should not be imposed, Rice mentioned a case where the defendant was mentally ill. Rice stated she was familiar with the capital case of Winthrop Eaton. Rice did not think it fair that Eaton, whom she knew and whom *124 she thought was mentally ill, had received a death sentence.
Unfortunately, at this point the prosecutor did not completely state the law and told Rice that only instances of extreme emotional disturbance could be considered as a mitigating circumstance. Rice told the prosecutor she did not think this was fair and was firm in her belief that some evidence of emotional disturbance from an expert witness would influence her decision.
In later questioning, Rice said she could consider a life or death sentence. She stated she could follow the law and would not let anything she knew about the Eaton case enter into her judgment on the mental condition issue in this case. Without further questioning, Rice was excused on a state cause challenge; the defense objected.
"[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Bourque, 622 So.2d 198, 226 (La.1993), citing State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). A trial judge has great discretion in determining whether sufficient cause has been shown to reject a prospective juror. Such determinations will not be disturbed on review unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Lee, 93-2810, p. 9 (La. 5/23/94); 637 So.2d 102, 108; State v. Robertson, 92-2660 (La. 1/14/94); 630 So.2d 1278, 1281; State v. Bourque, 622 So.2d 198, 226 (La.1993).
A trial judge's great discretion is based on the fact that
the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys. Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record. Furthermore, to the extent he or she believes it is necessary or desirable to do so, the trial judge has the benefit of the ability to directly participate in the examination of the members of the jury venire. As such, we are reluctant to reverse a ruling of the trial judge on a challenge for cause where it does not appear from a review of the record as a whole that the trial judge has somehow abused his discretion.
Lee, supra p. 9, 637 So.2d at 108.
There was no abuse of the trial judge's discretion in excusing Rice for cause. Despite her later protestations that she would not allow anything she knew about the Eaton case to enter into her judgment, the trial judge obviously did not accept her protestations based on her earlier responses. A review of her voir dire shows Rice may not have been impartial or may have automatically voted against capital punishment if there was evidence of mental health issues. La. C.Cr.P. art. 797(2) and art. 798(2)(a). This assignment of error has no merit.
II. Attorney Conflict of Interest: Assignments of Error # 2, 13
The defendant argues that his appointed lead counsel, E. Roland Charles, had an actual conflict of interest which denied Tart effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and La. Const. art. I, § 13. The defendant also argues the trial judge erred in failing to make further inquiry as to this conflict when the defendant sought to have Charles replaced as counsel immediately prior to trial.
Charles was one of two attorneys originally appointed to represent the defendant in September, 1989. In August 1990, Charles was relieved of his appointment while he ran for judicial office. He was reappointed as lead counsel on December 3, 1990. Tart was represented at one pretrial suppression hearing by Charles and D.C. Bernhardt. He was represented at a later suppression hearing by Charles and Robert Stephen Tew. Charles and Tew represented Tart at trial.
Charles' prior representation of Shelby Sneed, a prosecution witness at Tart's trial, for two unrelated criminal charges serves as the basis for Tart's conflict of interest claim. Throughout its appellate brief, the *125 defense has argued its belief that Sneed was acting as a police informant, was purposely placed next to Tart, and actually coerced Tart into confessing to the Quenan murders. Tart maintains that Charles' prior representation of Sneed prevented the defense from effectively cross-examining Sneed as to: 1) his role in the Quenan murder investigation, 2) any benefits he received from his purported actions, and 3) his motives for testifying.
Documents relating to Sneed's criminal prosecutions, appended as exhibits to the defendant's brief but not accepted as part of the record, indicate Charles and/or Jay Nolan was/were appointed to represent Sneed on September 15, 1989, for the offense for which he was incarcerated with Tart. The documents reflect that by September 26, 1989, Sneed's offense was amended to illegal possession of stolen property. Charles also represented Sneed in connection with April 1990 charges of two counts of distribution of cocaine and one count of conspiracy to distribute cocaine. The documents show the two counts of distribution, and the illegal possession of stolen property charge, were dismissed pursuant to a plea bargain in which Sneed pleaded guilty to the conspiracy charge. Sneed received a six year sentence on the conspiracy charge on February 19, 1991. Even according to these exhibits which are outside of the record, it is clear Charles' active representation of Sneed ended February 19, 1991, prior to Tart's trial.
On the first day of trial, just prior to the beginning of jury selection, Tart personally addressed the court:
Tart: I want to know if I can get another head lawyer because I don't think Roland Charles is working as hard as he could on my case.
Court: Do you have anything in support of that other than just your statement to that effect?
Tart: Yes, sir. When we come down to court, sir, and when we are arguing and it's the defense ... I don't know what they call it ... looks like he's sitting down like he is drinking coffee out here and I don't trust him. Like I had to file my own motions to get up on paperwork up there and he won't give it to me and I don't trust him.
Court: All right. Mr. Tart, thank you. Let the motion be denied.
Tart: Denied?
Court: Denied, Mr. Tart. Have a seat.
R. Vol. 6, p. 1151-1152.
"The issue of conflicting loyalties usually arises in the context of joint representation" but "can also arise where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney." State v. Kirkpatrick, 443 So.2d 546, 552 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). If an objection as to a possible conflict of interest is raised pretrial, the trial court must appoint separate counsel or determine if the claimed risk is too remote. If an objection to an attorney conflict of interest is not raised until after trial, the defendant must show he was actually prejudiced. State v. Marshall, 414 So.2d 684, 687-688 (La.1982), cert. denied, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), relying on Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) and Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); State v. Edwards, 430 So.2d 60, 62 (La.1983). Tart fails to prove that an actual conflict of interest arose.
The defendant raised objection to Charles pretrial. Although inarticulate in his reasons for wishing to have Charles replaced, appellate counsel cites the possible conflict of interest as the motivating factor behind Tart's request. Under Holloway, the trial judge had two options to avoid a possible conflict of interest: appoint separate counsel or hold a hearing to determine the risk factor. The trial judge properly denied the request because one of the two available options was already in place. Separate counsel was already appointed. Although Charles might have had a possible conflict of interest over his past representation of Sneed and his current representation of Tart, his co-counsel, Robert Tew, suffered no such impediment. In its argument the defense ignores the fact that it was Tew, and not Charles, *126 who cross-examined Sneed both at the pretrial suppression hearing and at trial.
Any possible conflict of interest regarding Charles' prior representation of Sneed never became an actual conflict. "An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties." State v. Carmouche, 508 So.2d 792, 797 (La.1987). In Carmouche, defendant was represented by an attorney who had also represented a prosecution witness. Carmouche held "any conflict here was only potential until such time as defense counsel might choose to cross-examine and impeach his client [witness] before the jury regarding confidential matters or bias, particularly in relation to [the witness's] reasons for testifying." Id., 508 So.2d at 797. Since Charles did not cross-examine or try to impeach his former client, no actual conflict arose. The appropriate remedy stated in Carmouche, as well, was appointment of other counsel. These assignments of error have no merit.
III. Admissibility of Defendant's Statements: Assignments of Error # 3, 4, 27, and 29
The defendant argues his rights under the state constitution, La. Const. art. I, § 13, and federal constitution, Fifth, Sixth, Eighth, and Fourteenth Amendments, were violated by police questioning and that the trial judge erred in ruling admissible statements obtained from him on September 11, 1989 and September 13, 1989.

Voluntariness of Defendant's Statements
The defendant claims he was incapable of knowingly and voluntarily waiving his constitutional rights because he is mentally disabled and emotionally disturbed; thus, his confession to three burglaries obtained September 11, 1989, and his confession to the Quenan homicides obtained September 13, 1989, should not have been admitted at his trial.[4] The trial judge denied his motion to suppress on this ground finding that, other than an allegation of mental incompetency, the defendant offered nothing to substantiate his claim. The trial judge was convinced that the defendant fully understood his rights notwithstanding his limitations.
The state is required to show beyond a reasonable doubt that a statement was made freely and voluntarily before it may be introduced in evidence against a defendant. State v. Brooks, 92-3331, p. 12 (La. 1/17/95); 648 So.2d 366, 373; State v. Wilson, 467 So.2d 503, 518 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); State v. Howard, 414 So.2d 1210, 1214 (La.1982). "A diminished intellectual capacity does not alone vitiate a defendant's ability to make a knowing and intelligent waiver of Miranda rights and confess voluntarily; the critical factor is whether defendant was able to understand the rights as explained to him and voluntarily give a statement." Wilson, 467 So.2d at 519. The trial court's determination of a statement's admissibility is due deference if supported by the record. Brooks, p. 11; 648 So.2d at 373; Howard, 414 So.2d at 1214.
The suppression hearing record supports the trial judge's determination. When Sgt. Freeman spoke to Tart September 11, 1989, about the jewelry they had received from individuals which appeared to be linked to Tart, Tart seemed a little upset. However, Sgt. Freeman noted Tart was not crying, seemed to understand his rights and knew what they were talking about. R. Vol. 4, p. 639. Trooper Buckley agreed that Tart was acting normally. R. Vol. 4, p. 698. Sgt. Burrell noticed nothing unusual about Tart's mental or emotional state. R. Vol. 4, p. 758. At the beginning of his recorded statement, Tart stated he had completed the seventh grade and then went to Bastrop High School for a learning disability course for a year. Although Tart stated he could not read very well, he could write and understand well. He affirmed he understood each of his rights when Sgt. Freeman questioned him. See Ex. S-7, p. 1, Suppression Hearing 3/11/91.
*127 Before taking Tart's confession on September 13, 1989, Sgt. Freeman was aware that Tart had eight years of school and had taken special education classes. Sgt. Freeman noticed no change in Tart's physical or mental condition. Although Tart was admittedly upset, he seemed to understand his rights, spoke clearly to police, and made logical responses to questioning. R.Vol. 4, p. 644, 649. Officer Sarah Coleman, who was acting as jailer and who relayed to Sgt. Freeman that Tart wished to make a statement, testified that nothing appeared wrong with Tart. R.Vol. 4, p. 693. Trooper Buckley agreed that Tart had all his faculties. Buckley testified that Tart appeared to understand everything and the fact that Tart had only an eighth grade education did not appear to limit his ability. R.Vol. 4, p. 699. At the beginning of his recorded confession, Tart again stated his educational background. He again stated that, while he did not read very well or quickly, he could write and understand well. He again maintained he understood all of his rights. See Ex. S-84, p. 1.
Other than a mere allegation, Tart offers no evidence of diminished intellectual capacity or emotional problems which would vitiate his ability to make a knowing and intelligent waiver of his rights. The state is not required to negate a mental abnormality which the defendant alleges but fails to prove. Howard, 414 So.2d at 1214. Tart references an August 25, 1989 Bastrop Mental Health Clinic report completed just days before the Quenan homicides as evidence of emotional distress. This report chronicles Tart's discussion of suicidal and homicidal tendencies. The record shows, however, that the registered nurse therapist making the report was only relating what Tart told her and was not otherwise qualified to make a diagnosis. The therapist testified at a motion hearing that on August 25, 1989, Tart was neat, clean, well-mannered, co-operative and oriented. Although she recommended he return for a more detailed evaluation and possible therapy, he was eating and sleeping well and required no medication. R.Vol. 5, p. 855-860.
This Court may consider all pertinent evidence adduced at trial and before this Court to review the trial court's determination; the Court is not limited to evidence adduced at suppression hearings alone. Brooks, p. 10; 648 So.2d at 372.
The Sentence Investigation Report (SIR) provides possible reasons to discount Tart's claims of mental disability. The SIR was completed by a Ouachita Parish investigator pursuant to La.C.Cr.P. art. 905.9.1 § 3 to aid this Court in its review for sentence excessiveness. Tart told the investigator he had lied to the nurse therapist at the Bastrop Mental Health Clinic on August 25, 1989. He asserted he had been sent there by his step-mother Irma Peoples "to act crazy so a check could be received for the household" for some sort of disability. Tart related he knew his interviewer thought he was lying, so he talked to her about reentering school. His arrest prevented him from any school reentry. See SIR, p. 7. The therapist's testimony substantiates this in part. She testified they talked mostly about school opportunities and that Tart's problem appeared to be difficulty learning.
At the penalty phase, the defense presented the testimony of a former coach and teacher of the defendant. Mr. Jones testified that, while Tart had trouble spelling, he understood the material covered and could verbally answer exam questions correctly. R.Vol. 8, p. 1734. He agreed with Tart's self-characterization as someone who could not read well, but understood well. R.Vol. 8, p. 1736. Tart's assertion of limited education would not vitiate his knowing and voluntary waiver of rights.
The record fully supports the trial judge's ruling that the defendant's alleged mental incapacity did not affect his ability to make a knowing and intelligent waiver of constitutional rights and to voluntarily confess.

Fifth and Sixth Amendment Concerns
Tart claims that his right to counsel under both the Fifth and Sixth Amendment was violated by police interrogation and that his September 11, 1989 and September 13, 1989 confessions obtained in violation of these rights should have been suppressed.
*128 A brief restatement of the facts is helpful to this discussion: Suppression hearing testimony from police officers established Tart was picked up for questioning September 7, 1989, after a report that he was in possession of jewelry. He was given Miranda warnings at 1:30 p.m. and at 3 p.m. He authorized a limited permission to search his bedroom which was additionally authorized by his stepmother. Officers executing the permission to search found more jewelry in Tart's bedroom. He was arrested for possession of stolen property in the afternoon.
Tart appeared before a judge for a 72-hour hearing on the charge of possession of stolen property on Monday, September 11, 1989. At this time bond was set but no counsel was appointed. The assistant district attorney handling the case remembers Tart stating he was going to make bond; it was the trial judge's procedure not to appoint counsel if the defendant could make bond or if he wanted to obtain retained counsel. R.Vol. 4, p. 743-751; Defendant's Brief, Ex. 2 Deposition of J. Joyce, p. 10. The trial judge knew that Tart was a possible suspect in the Quenan homicides, in that police were conducting further investigation. Defendant's Brief, Ex. 1 Transcript of September 11, 1989 Bench Conference; Ex. 2 Deposition of J. Joyce, p. 3, 6.
Later on September 11, 1989, the police obtained information about other jewelry connected to Tart from Willie Jean and Ruffin Mason. This, plus the jewelry previously obtained from Tart's bedroom which had been identified as belonging to Ms. Robertson, led officers to question Tart further that evening. After orally administering Miranda rights, police officers obtained an unrecorded oral confession from Tart admitting to burglaries of the Berry, Robertson, and Quenan residences. Police officers agreed Tart thereafter refused to give a recorded statement and invoked his right to counsel. Tart was arrested for burglary at 7:30 p.m. Later that evening, Tart's half-brother made a statement to police which incriminated him in the Quenan homicides.
On September 12, 1989, jewelry obtained from Kendale Leonard the previous day was identified as belonging to the Quenans. On September 13, 1989, Tart, through Sneed, initiated contact with police officers and confessed to the Quenan homicides. Tart was arrested for two counts of first degree murder. He appeared before a judge for a 72-hour hearing on the first degree murder charges on September 14, 1989. Tart was indicted by the grand jury on two counts of first degree murder on September 21, 1989. R.Vol. 4, p. 745.
At trial, the same testimony was provided with the exception that one of the officers involved in the investigation, Sgt. Burrell, testified Tart requested an attorney after officers spoke to him at 3 p.m. on September 7, 1989. R.Vol. 7, p. 1318-1319. The record shows this officer may have been confused by the several arrests and multiple statements. Whether Tart requested counsel on September 7, 1989, or later on September 11, 1989, affects the Fifth Amendment analysis. These assignments of error will be analyzed using both dates.

Fifth Amendment
The Fifth and Fourteenth Amendment prohibitions against compelled self-incrimination require that custodial interrogation be preceded by advice to the suspect that he has the right to remain silent and also the right to the presence of an attorney. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378 (1981) established the bright-line rule that once a suspect has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

a. September 13, 1989 confession
The suppression and trial testimony showed that, regardless of whether Tart requested counsel on September 7 or 9, the September 13, 1989 confession was initiated by the defendant. Police did not talk to Tart between his September 11, 1989 invocation of *129 the right to counsel and his September 13, 1989 confession. R.Vol. 4, p. 676; R.Vol. 7, p. 1454. Acting as jailer, Officer Sarah Coleman investigated banging on the maximum security cell door. She testified Sneed gestured toward Tart and stated Tart wanted to talk to a detective. Tart stated he did want to talk to a detective. Although Sneed spoke first, both Sneed and Tart stated Tart wanted to talk to police. R.Vol. 4, p. 692, 693. After being summoned by Officer Coleman, Sgt. Freeman and Trooper Buckley asked Tart if he wanted to talk to them. Tart said he wanted to make a statement. R.Vol. 4, p. 692, 693; R.Vol. 5, p. 930; R.Vol. 7, p. 1442-1443, 1446-1449.
The defendant argues Sneed was actually working for the police, and Sneed's summoning of officers at Tart's request converted this into a police-initiated contact. The record shows this was not so. All officers denied that Sneed was working for the police or that Sneed was purposely placed in Tart's vicinity to collect information. Although Sneed had previously worked as a police informant, he denied that he was doing so in this case. The record does not support Tart's accusation that Sneed obtained any benefit for his actions in Tart's case. R.Vol. 4, p. 819-822; R.Vol. 5, p. 905, 908-909, 928, 945, 951, 952, 958, 1011-1014.
Under Edwards, Tart initiated his contact with police on September 13, 1989. His confession to the Quenan homicides was not obtained in violation of his Fifth Amendment right to counsel.

b. September 11, 1989 confession
The officers' suppression hearing testimony uniformly agreed that, on September 11, 1989, Tart did not request an attorney until after he made a Mirandized unrecorded oral confession to the Berry, Robertson and Quenan burglaries. At that point, all questioning ceased as per Edwards.[5] Under this scenario, this statement was obtained constitutionally. The trial testimonies of Sgt. Freeman and Trooper Buckley are consistent with this view of the evidence.[6]
Sgt. Burrell's trial testimony was that Tart requested an attorney on September 7, 1989. If that were so, police-initiated questioning on September 11, 1989, after the defendant had previously requested an attorney, was in violation of the Edwards bright-line rule, and the confession to the Quenan burglary obtained in violation of Tart's Fifth Amendment right to counsel was erroneously admitted at Tart's trial.
A finding of error in this regard does not end our inquiry, however, because the erroneous admission of a confession is a trial error which is subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Under the facts of this case, even if we were to accept Sgt. Burrell's version of the facts over that of Sgt. Freeman and Trooper Buckley, any error in admitting Tart's confession to having previously burglarized the Quenan residence was harmless at his trial for two counts of first degree murder. Given the other trial evidence, the defendant's jury surely would have returned the same verdict at the guilt stage even if it had never learned of the prior burglary at the Quenan residence. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State v. Sanders, 93-0001 (La. 11/30/94), 648 So.2d 1272.
Tart's fingerprint was found on the vacuum cleaner pipe and his footprint was found on a business card scattered from Mr. Quenan's wallet at the crime scene. Both the fingerprint and footprint were left in the victims' blood. The defendant's September 13, 1989 confession to the murders, which was constitutionally obtained after he initiated contact with authorities, was properly admitted at trial.
If anything, the introduction of evidence relating to the prior Quenan burglary laid the groundwork for the defendant to be able to explain how his fingerprint came to be on the vacuum cleaner tube found at the murder scene. The defendant testified in the guilt phase against his counsel's advice. R.Vol. 8, *130 p. 1626. He admitted burglarizing the Quenan home earlier in the week, prior to the murders, and denied ever entering the house again. He specifically denied committing the murders and maintained his murder confession was the result of coercion. Tart testified his fingerprint was left on the vacuum cleaner tube during his earlier burglary and that the victims' blood overlay his fingerprint later; he maintained the footprint found at the murder scene was not his. R.Vol. 8, p. 1633-1642.
After his September 13, 1989 confession, Tart led police to the bushy area where he had thrown the van keys. It was only after Tart's murder confession that police became aware that a knife had been stolen from one of Dr. Baker's vehicles; Dr. Baker confirmed the missing knife after police asked him to check for it. Any violation of Tart's Fifth Amendment right to counsel in obtaining the September 11, 1989 burglary confession, and in admitting it at trial was harmless error.

Sixth Amendment
The Sixth Amendment right to counsel attaches only after the initiation of adversary judicial criminal proceedings. Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986); State v. Carter, 94-2859 (La. 11/27/95); 664 So.2d 367. This is so because
[t]he initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.
Kirby v. Illinois, 406 U.S. 682, 689-690, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Prior to the initiation of adverse judicial criminal proceedings, a person is merely a "suspect" rather than an "accused." Michigan v. Jackson, 475 U.S. at 632, 106 S.Ct. at 1409.
Tart was not arrested for two counts of first degree murder until after his September 13, 1989 confession. He appeared before a judge for his 72-hour hearing on the murder charges on September 14, 1989 and counsel was appointed. The Sixth Amendment right to counsel is offense specific. McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." Id. Thus, Tart's Sixth Amendment right to counsel for the murder charges did not attach until after he gave his September 11, 1989 burglary confession and his September 13, 1989 murder confession.
In a related argument, the defendant argues Sneed was acting as a state agent who was placed in his cell to coerce his murder confession in violation of his Sixth Amendment right to counsel, relying on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); and Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). These cases hold "that the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with the crime. After charges have been filed, the Sixth Amendment prevents the government from interfering with the accused's right to counsel." Illinois v. Perkins, 496 U.S. 292, 299, 110 S.Ct. 2394, 2398-2399, 110 L.Ed.2d 243 (1990). Since Tart's Sixth Amendment right to counsel for the murder charges did not attach until after his September 13, 1989 confession, and Sneed was not acting as a state agent, the cases relied on by Tart are inapplicable.
The defense also argues that the police improperly delayed charging the defendant with murder and that the subsequent investigation on the Quenan murders violated his Sixth Amendment right to counsel. "Those concerns, while certainly legitimate *131 ones, are simply not concerns implicating the right to counsel." United States v. Gouveia, 467 U.S. 180, 191, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984).
Under state law, a defendant's right to counsel under La. Const. art. I, § 13[7] attaches no later than the defendant's initial appearance or first judicial hearing. State v. Hattaway, 621 So.2d 796 (La.1993) overruled on other grounds, State v. Carter, supra.[8] The right to counsel under Art. I, § 13 of the state constitution and the right to counsel under the Sixth Amendment are coextensive in scope, operation, and application as to when the right to counsel attaches, at what subsequent stages it exists and whether it can be waived. Carter, p. 3, 20. Because the defendant had not even been arrested for murder at the time of his burglary and murder confessions, neither his Sixth Amendment nor his art. I, § 13 right to counsel had attached, and there can consequently be no violation of those rights.

Conclusion
Although the September 11, 1989 burglary confession may have been obtained in violation of Tart's Fifth Amendment right to counsel, its introduction in evidence in the guilt phase of Tart's trial was harmless error. Tart does not present any other Fifth Amendment violation or a violation of his Sixth Amendment right to counsel. These assignments of error have no merit.
IV. Admission of Evidence of Unadjudicated Crimes: Assignment of Error # 5
The defendant argues the trial court erred in allowing the state to present evidence of unadjudicated crimes during the penalty phase which violated the limitations placed on such evidence in State v. Jackson, 608 So.2d 949 (La.1992). The defendant also complains he did not receive sufficient notice that this evidence would be offered by the state at the penalty phase.
At the penalty phase the state presented testimony from Sgt. Freeman regarding burglaries Tart committed at the Berry and Robertson homes while he did yard work for Cleveland Holmes. Sgt. Freeman testified that Tart made an oral confession to these crimes September 11, 1989. Jewelry was taken in each case and was identified by its owners, Wanda Berry and Anita Robertson, in court.
The state also presented the testimony of Uradell Savage, who stated her home had been burglarized in May of 1989 when keys to her new car were stolen. Her car was recovered in the Bastrop Cemetery during a high speed chase but was completely wrecked. She testified that a few days later, Tart came to her home to tell her he had wrecked the car and asked her not to testify against him because a conviction would ruin his life and his chances of joining the Navy. The incident was prosecuted in city court as unauthorized use of a vehicle, a misdemeanor.
At the time of Tart's November 1991 trial, State v. Brooks, 541 So.2d 801, 814 (La.1989) set forth the standard for introduction of evidence of unadjudicated crimes at penalty phase determinations. Such evidence was admissible once the trial court determined: 1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing; 2) the proffered evidence is otherwise competent and reliable; and 3) the unrelated crimes have *132 relevance and substantial probative value as to the defendant's character and propensities.
After Tart's trial, this Court restricted the type of evidence admissible under Brooks. Jackson, 608 So.2d at 955, limited evidence of unadjudicated crimes presented in the penalty phase of a capital trial to crimes which involve violence against the person of the victim and those for which the time limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried. Jackson held these limitations were necessary "to insure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing." Id.
State v. Sanders, 93-0001 (La. 11/30/94); 648 So.2d 1272, gave retroactive effect to other limitations[9] announced in Jackson to a case pending on appeal at the time Jackson was announced. Sanders held Jackson announced a new rule which, under Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), required that retroactive effect be given to cases pending at the time the rule was announced. Jackson did not state its new limitations would have prospective application. Sanders, p. 22; 648 So.2d at 1289 fn. 15.
Sanders reviewed a Jackson error for harmless error. Id., p. 25; 648 So.2d at 1291. The inquiry is whether the capital sentence "actually rendered in this trial was surely unattributable to the error." State v. Code, 627 So.2d 1373, 1384 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994), quoting Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Tart's appeal was also pending at the time Jackson announced its new rule limiting the type of evidence of unadjudicated crimes which could be admitted at penalty phase hearings. This Court will extend retroactive application of the Jackson limitations to this case and finds the state improperly admitted evidence of unadjudicated crimes that did not involve violence against the person of the victim. So finding, we pretermit Tart's argument regarding lack of notice and determine whether the improper admission of this evidence was harmless error.
This Court has already found that Tart's September 11, 1989 confession to burglaries at the Quenan, Berry and Robertson homes may have been obtained in violation of his Fifth Amendment right to counsel. The erroneous admission of evidence of the Quenan burglary in the guilt phase was found to be harmless error since the verdict actually rendered in this case was surely unattributable to the error. This conclusion was based, in part, on Tart's own use of this evidence as his defense. See Assignment of Errors # 3, 4, 27 and 29.
During his guilt phase testimony, Tart additionally admitted his involvement in other burglaries. Specifically, when cross-examined about jewelry he had given away to others, Tart stated the jewelry came from the Quenan house and two other houses. Further questioning trying to pin down that items of Quenan jewelry were recovered elicited Tart's response that he had stolen all the jewelry police recovered from his bedroom during burglaries but did not know which house he had taken it from. R.Vol. 8, p. 1660. The penalty phase evidence presented by the state filled in the details of Tart's own testimony regarding the Berry and Robertson burglaries. Thus, the improperly admitted evidence did not present any new evidence of Tart's criminal propensities which the jury had not heard from Tart himself. The only evidence which was entirely new was that of the Savage incident which was prosecuted as a misdemeanor. Our review of this error convinces us that the *133 capital sentence rendered by the jury in this case was surely unattributable to this error. This assignment of error has no merit.

CAPITAL SENTENCE REVIEW
This Court reviews every death sentence to determine if it is excessive. La.C.Cr.P. art. 905.9. Under Supreme Court Rule 28, the factors reviewed include: (1) whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors; (2) whether the evidence supports the finding of one or more statutory aggravating circumstances; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

PASSION, PREJUDICE OR OTHER ARBITRARY FACTORS
Tart was a 20 year old African-American on trial for the murder of two elderly white victims. The defense argues that race played an inevitable part in this case and refers to its assignments of error regarding juror selection. As discussed in the appendix, this claim has no merit. See Assignment of Error # 7.
The defense argues the trial court's failure to grant the defense's second motion for change of venue resulted in a verdict and sentence based on passion. Due to extensive publicity, this matter was initially moved from Morehouse Parish to Ouachita Parish. Each juror was questioned about their foreknowledge during voir dire. The jury was sequestered the entire time of the trial. As discussed in the appendix, this claim had no merit upon review. See Assignment of Error # 24.
The defense also argues that the introduction of evidence of unadjudicated burglaries and a misdemeanor at his penalty hearing introduced irrelevant and arbitrary factors into the jury's sentencing decision. As discussed in Assignment of Error # 5, supra, the improper admission of this evidence did not inject an arbitrary factor into the jurors' determination and the capital sentence was surely unattributable to this error.

AGGRAVATING CIRCUMSTANCES
The jury found two aggravating circumstances: (1) Tart was engaged in the perpetration or attempted perpetration of aggravated burglary, armed robbery, or simple robbery; and (2) Tart knowingly created a risk of death or great bodily harm to more than one person.
Tart's own confession related how he returned to the Quenan residence on the evening of September 6-7, 1989, with the intention of burglarizing the residence and stealing jewelry. There was evidence that Tart broke into the Quenan home while armed with a hunting knife stolen from a vehicle next door. He removed his clothing, apparently to keep them from becoming bloody, and lured the Quenans from their beds. Jewelry from several cases was found in disarray at the crime scene. Mr. Quenan's wallet and its contents were strewn on the floor. Tart admitted taking the keys to the Quenans' van. The evidence clearly established that Tart committed an aggravated burglary and an armed robbery or simple robbery in committing the Quenan murders.
Tart also admitted slashing and stabbing both Mr. and Mrs. Quenan in his pursuit of their jewelry. Tart's bloody fingerprint and bloody footprint were found at the scene. The bodies of the victims showed their assailant had cut their carotid arteries and jugular veins during the assault. The larynx on each victim was also severed, possibly to prevent their screaming. The location and amount of blood throughout the Quenans' bedroom and hallway showed an extremely violent and far-ranging struggle took place. Evidence developed at the autopsy showed this struggle lasted a considerable amount of time. The evidence clearly established Tart knowingly created the risk of death or great bodily injury to more than one person.

PROPORTIONALITY
At the time of the crime, the defendant was a twenty year old African-American who had never married and had no children. He was one of two children born to the common-law union of his parents. His *134 mother had two children by a previous relationship; his father had one child by a subsequent relationship. Tart's mother left him and her other children to move to California when Tart was one year old. He subsequently lived with paternal aunts in Connecticut and Mississippi, and with his father and common-law "stepmothers".
School records show Tart failed the second grade and was socially promoted to the third and fourth grades. He failed the fifth grade twice and was in the seventh grade when he dropped out the first time. School evaluations showed Tart was classified as being learning disabled but not mentally retarded. He was placed in special education classes beginning in 1979. Tart reentered the school system by attending Bastrop High School in the non-graded program and was working toward a certificate of completion. Bastrop High School records indicate some discipline problems such as a suspension for skipping, for violating closed campus rules, and for fighting. Tart was subsequently dropped from the special education classes for failure to attend.
Psychiatric testing after his conviction revealed no character or behavior disorders and no other pertinent psychiatric or psychological information. Although no I.Q. was determined at this time, the state asserts in brief that earlier school testing determined Tart's I.Q. as 82. The defense does not contest this result. Although Tart stated in his confession that he had been drinking heavily the night of the murders, his thought-out preparation for the crime shows he was not under the influence of alcohol at the time of the offense.
Although Tart listed former employment with the Farmer's Market and Domino's Pizza, no employment records were found by the investigator compiling the report for the SIR. Tart did work daily, though part-time, with Cleveland Holmes doing yard work. Holmes characterized Tart as a good worker. Holmes had no suspicion of drug or alcohol abuse or theft, nor had he seen Tart display any violence or throw any temper tantrums. Tart had no juvenile record. His only prior conviction, for failure to appear, resulted in a fine of $25 and costs or five days jail.
The victims were a seventy year old man and his sixty-six year old wife. Both victims were Caucasian. The defendant knew his victims since he had performed yard work for them.
Tart was represented by two appointed attorneys. His lead attorney, E. Roland Charles, had over ten years of legal experience; the other attorney, Robert S. Tew, had between five and ten years of legal experience. Both attorneys have mostly criminal law practices.
Since January 1, 1976, juries in the Fourth Judicial District Court for Ouachita and Morehouse Parishes have returned the death penalty in four cases, one of which was tried there on a change of venue prior to 1985. The state asserts that from January 1, 1976 to January 1, 1985, it was the policy of the District Attorney not to seek the death penalty in any first degree murder case if the defendant would plead guilty and agree to a life sentence. See State's Sentence Review Memorandum, p. 5.
State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980), was tried in Ouachita Parish after the defendant was indicted in Lafayette Parish for the first degree murder of State Trooper Donald Cleveland. Prejean shot Trooper Cleveland when Cleveland pulled over a car Prejean was driving for a malfunctioning taillight. A death sentence was imposed in State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981), where the defendant beat his 85-year old victim, a former neighbor, during an armed robbery in her home. The victim subsequently died of the injuries inflicted. A death sentence was also imposed in State v. Divers, No. 46968, where the defendant was convicted of two counts of first degree murder. Both victims had been bound with electrical cord, gagged, and shot once in the head with a small caliber handgun. The defendant stole a car belonging to one of the victims. Divers is presently pending review by this Court.
Of 21 other cases charged as first degree murder, 2 received life sentences by juries, 5 pleaded guilty to first degree murder without *135 capital punishment, 8 pleaded guilty to second degree murder, 5 pleaded guilty to lesser offenses, and 1 was convicted of a lesser offense by a jury.
The death sentence has been imposed in other similar cases statewide. See State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (where defendant shot 65 year old man and his 56 year old invalid wife in their home during robbery); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985) and State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (where defendants bound and gagged an older couple in their home, shot them, and stole their car). The death penalty has also been imposed on defendants with little education and low to normal intelligence. State v. Brogdon, 457 So.2d 616 (La. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985) (defendant was borderline personality with I.Q. of 60-80); State v. Watson, 449 So.2d 1321 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985) (defendant had low to normal intelligence, a seventh grade education, a minimal employment record, a history of drug abuse and an extensive history of incarceration during his adult life). Tart's death sentence is not disproportionate to that imposed in similar cases in Louisiana.
For the reasons assigned, and the discussion of other assignments of error in the appendix to this case, the convictions and death sentence of defendant, Willie Lee Tart, are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution as provided by LSA-R.S. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
AFFIRMED.
CALOGERO, C.J., concurs in affirming defendant's conviction but dissents from affirmance of penalty, and assigns reasons.
LEMMON, J., dissents in part from affirming the sentence and assigns reasons.
JOHNSON, J., dissents and assigns reasons.

APPENDIX

Pretrial Issues

Assignment of Error # 14
The defendant argues he was not present at critical trial hearings in violation of Louisiana law and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.
La.C.Cr.P. art. 831 sets forth the stages of trial where the presence of a felony defendant is mandated.[1] La.C.Cr.P. art. 832 provides a felony defendant cannot object to his temporary voluntary absence from the art. 831 proceedings if his counsel was present. This waiver does not apply to capital defendants. However, La.C.Cr.P. art. 834 states that, while a defendant has a right to be present, his presence is not essential to *136 the validity of 1) pretrial proceedings, 2) trial proceedings when the jury is not present except when determining the admissibility of evidence, and 3) post-trial proceedings. Each separate instance where the defendant claimed his presence was improperly waived has been reviewed.
The defendant claims his presence was improperly waived by his counsel during a March 20, 1990, proceeding at which the trial judge ruled on a motion for change of venue from Morehouse Parish, where the crime occurred, to Ouachita Parish. R.Vol. 1, p. 8. The record shows the motion for change of venue and a memorandum in support were filed by the defendant based on widespread publicity. R.Vol. 1, p. 123-128. The state joined in the motion, as reflected in the order signed March 26, 1990. R.Vol. 1, p. 146. Counsel also stipulated that the change of venue be made
with the understanding that the defendant may also seek a Change of Venue from Ouachita Parish upon showing to the Court that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in Ouachita Parish where the prosecution is now pending.
No evidence was adduced and no argument of counsel occurred. The defendant achieved all he sought by his motion; there was no violation of La.C.Cr.P. art. 831; this was a preliminary motion under La.C.Cr.P. art. 834.
The record shows other asserted instances of waiver of the defendant's presence at pretrial proceedings are equally meritless. On February 20, 1990, the court only reset the hearing date for motions. R.Vol. 1, p. 7. On July 15, 1991, the trial date was reset. R.Vol. 1, p. 27. On January 7, 1992, no action was taken by the court. R. Vol. 1, p. 48.
On November 28, 1989, the defendant's presence was not waived as incorrectly alleged by the defense. The defendant was present in court, and questioned, at a hearing on appointed defense counsel's motion to withdraw. R.Vol. 3, p. 515-518. On May 16, 1990, the defendant's presence was not waived as incorrectly alleged by the defense. The record shows the defendant was present in court for a hearing on several motions regarding the defendant's mental health. R.Vol. 3, p. 538-549.
On October 4, 1990, the trial judge considered, in chambers with both counsel present, the issue of whether the defendant's Motion in Limine to Prohibit Introduction of Evidence of Other Crimes and Bad Character needed to be heard pretrial or during trial. There is no indication that the defendant was present. R.Vol. 5, p. 847. This determination was a pretrial ruling, at which defendant's presence was not required. At the hearing on the motion in limine October 10, 1991, all evidence was adduced in the defendant's presence. R.Vol. 6, 1128; R. Vol. 1, 29.
The defendant asserts the trial court improperly ruled on the motion to suppress his September 13, 1989 confession outside his presence. The record shows that a two-day hearing was held in the defendant's presence on this issue, August 15 and 17, 1990. R.Vol. 1, 16-17; R. Vol. 4, 634-831. The trial judge took the issue under advisement, earlier stating he would listen to tapes and other evidence introduced at the hearing. R.Vol. 4, p. 834. Written rulings were filed without taking further evidence and without further argument. R.Vol. 2, p. 352-356. Although this was a pretrial hearing at which the defendant's presence was not required under art. 834, to the extent it determined the admissibility of trial evidence, the defendant was present. See La.C.Cr.P. art. 831(A)(4). This assignment of error has no merit.

Assignment of Error # 24
The defendant argues the trial court's failure to grant his motion for change of venue from Ouachita Parish was an abuse of discretion and a violation of his state and federal constitutional rights. The defendant asserts the Quenan murders were widely publicized in Morehouse Parish, where the crimes occurred, and in neighboring Ouachita Parish. The defendant points to the state's acquiescence in the first venue motion to show the widespread nature of the publicity and argues *137 that the racial aspects of the crime prejudiced the community.
Morehouse and Ouachita Parishes are adjacent and together comprise the Fourth Judicial District. After the trial court granted his motion for change of venue from Morehouse Parish to Ouachita Parish, the defendant filed a motion to move the trial from Ouachita Parish. R.Vol. 2, p. 395-396.
La.C.Cr.P. art. 622 provides the grounds for a change of venue:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
It is the defendant's burden to show such prejudice exists in the collective mind of the community that a fair trial is impossible. State v. Thompson, 516 So.2d 349, 352 (La. 1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); State v. Wilson, 467 So.2d 503 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). "The defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish." Wilson, 467 So.2d at 512. Whether the requisite showing is made by the defendant is a matter of the trial court's discretion, which will not be disturbed absent an affirmative showing of error and abuse. Thompson, 516 So.2d at 352; Wilson, 467 So.2d at 512.
Several relevant factors may be considered in determining the propriety of a venue change, including: "(1) the nature of pre-trial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire." State v. Bell, 315 So.2d 307, 311 (La.1975).
The defendant failed to meet his burden under La.C.Cr.P. art. 622. The court conducted a "dry run" venire of 30 individuals to assess the collective mind of the community. Although many of the individuals questioned knew about the Quenan murders, their responses showed there was not a collective community feeling which would deny the defendant a fair trial. R.Vol. 2, p. 409; R.Vol. 6, p. 1027-1124. The trial judge specifically found the defendant failed to show that jurors' answers on voir dire would be affected or that the testimony of witnesses at trial would be affected by publicity. R.Vol. 6, p. 1124-1126. The record shows the trial judge imposed a gag order as to both state and defense attorneys and personnel. R.Vol. 3, p. 521-522.
The voir dire questioning showed almost all of the prospective jurors knew something about the case. The defendant is not entitled to a jury that is entirely ignorant of his case. Thompson, 516 So.2d at 352; State v. Brown, 496 So.2d 261, 263 (La.1986). When a prospective juror was unable to put aside his or her opinion and follow the law, they were struck from the panel. The trial judge did not abuse his discretion in denying defendant's second motion for change of venue. This assignment of error has no merit.

Assignments of Error # 17, 25, 26
The defendant argues the trial judge erred in failing to hold an ex parte hearing on defendant's motion for funds for expert psychiatric assistance and in allowing the state unauthorized access to the defense's expert findings. The defendant asserts the trial judge erred in failing to appoint a sanity commission. The defendant also challenges the "clear and convincing" standard by which a defendant must prove lack of competency to proceed in La.C.Cr.P. art. 648.
*138 Most hearings are to be held in an open, contradictory fashion, with ex parte hearings being the exception rather than the rule. State v. Touchet, 93-2839, p. 6, 11 (La. 9/6/94), 642 So.2d 1213, 1217 and 1220. While an indigent defendant may file a motion for ex parte consideration of a request for expert assistance, he is not entitled to an ex parte hearing absent a showing of prejudice. Touchet, p. 11, 642 So.2d at 1220. Touchet, p. 14, 642 So.2d at 1221 provides:
an indigent defendant may file a motion for expert funding ex parte. Notice of the filing of the motion should be given to the state, which may file an opposition to the hearing being held ex parte and/or to the request for funding. The trial court should first determine, in camera, either on the face of the allegations of the motion or upon taking evidence at an ex parte hearing, whether the defendant would be prejudiced by a disclosure of his defense at a contradictory hearing. If so, then the hearing on expert funding should continue ex parte. If not, then the hearing should be held contradictorily with the District Attorney.
The record shows that the defense did not seek ex parte consideration of its motion for expert funds. R.Vol. 1, p. 158. In fact, the defense attached both a copy of the August 25, 1989 Bastrop Mental Health Clinic report and the defendant's September 1, 1989 release to the state of all medical records to its motion. The Touchet safeguards are inapplicable here.
The defendant complains more generally about the trial judge's handling of the mental health issues raised. A review of the record shows no basis for complaint. The defendant initially entered a not guilty plea. R.Vol. 1, p. 5. The trial court granted the defendant's motions for a psychiatric expert and the defendant was duly examined. R.Vol. 2, p. 269, 405; R.Vol. 3, p. 535. When the defense objected to the state's request to examine the defendant, the trial judge deferred ruling until the defense determined mental health issues might be raised. R.Vol. 1, p. 211; R.Vol. 3, p. 572-581. After the defendant changed his plea to not guilty and not guilty by reason of insanity, a hearing was held at which the defendant was allowed to show evidence of both lack of competency to proceed and insanity at the time of the offense. R.Vol. 1, p. 22; R.Vol. 2, p. 404.
Despite being warned in earlier hearings that the report from the Bastrop Mental Health Clinic was insufficient to prove lack of competency or insanity at the time of the offense, the defendant failed to provide any other evidence than the testimony of the registered nurse therapist, Ellen Gregory, who drafted the report after her August 25, 1989 meeting with the defendant. R.Vol. 3, p. 535, 574. Her testimony showed she was not qualified to make a psychiatric diagnosis. R.Vol. 5, p. 856, 859-860. Her testimony also showed that despite his reported psychological problems, Tart was neat, clean, well-mannered, friendly, cooperative, oriented and friendly. This was true even at their meeting on September 7, 1989, the day after the murders. R.Vol. 5, p. 858.
The trial judge found the defense presented no evidence supporting lack of present competency. The record bears out this finding. The trial judge knew the defendant had been examined by a psychiatric expert and concluded that her report was not presented because it would not support the defendant's claim. R.Vol. 5, p. 862-863.
La.C.Cr.P. art. 648(A) was amended by Acts 1990, No. 755, § 1, effective September 7, 1990, and provides in pertinent part:
Art. 648. Procedure after determination of mental capacity or incapacity
A. The criminal prosecution shall be resumed unless the court determines by clear and convincing evidence that the defendant does not have the mental capacity to proceed.
Prior to amendment, the article did not suggest a standard; jurisprudence held a defendant had to prove incompetency by a clear preponderance of evidence. See State v. Brooks, 541 So.2d 801, 805 (La.1989); State v. Perry, 502 So.2d 543, 549 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). Defendant's challenge to the clear and convincing standard of La. C.Cr.P. art. 648 is meritless. Since the defendant *139 presented no evidence, he could not meet that or any lesser standard.
La.C.Cr.P. art. 650 permits, but does not require, the appointment of a sanity commission to examine the mental condition of the defendant at the time of the offense after a defendant enters a dual "not guilty and not guilty by reason of insanity" plea. It is within the trial court's discretion to grant or deny appointment of a sanity commission. State v. Crawford, 410 So.2d 1076 (La.1982). Nothing in the record, especially considering the testimony of Ellen Gregory, suggests a need to determine the defendant's sanity at the time of the offense. There was no abuse of the trial court's discretion in failing to appoint a sanity commission. These assignments of error have no merit.

Voir Dire Issues

Assignment of Error # 6
The defendant argues the prosecutor's erroneous definition of the level of mental health evidence which could be considered as a mitigating circumstance in the penalty phase tainted the panel from which two jurors were chosen, thus invalidating the death sentences imposed.
While examining the first panel of prospective jurors, the prosecutor misstated the law of mitigating evidence. On numerous occasions the prosecutor stated that the only "legal" mitigating evidence of a defendant's mental health problems was that which satisfies the provisions of La.C.Cr.P. art. 905.5(b); i.e., that "[t]he offense was committed while the offender was under the influence of extreme mental or emotional disturbance." The defendant argues the jury was left with the impression that evidence of other mental problems which did not rise to the level of an extreme disturbance could not be considered.
Mental health evidence which does not rise to the level to satisfy La.C.Cr.P. art. 905.5(b) may nevertheless be considered as mitigating under La.C.Cr.P. art. 905.5(h), which allows a jury to consider "any other relevant mitigating circumstance." The prosecutor's comments were in error. "Nevertheless, a prosecutor's misstatements of the law during voir dire examination, or in his opening and closing remarks, do not require reversal of a defendant's conviction [or sentence] if the court properly charges the jury at the close of the case." State v. Cavazos, 610 So.2d 127, 128 (La.1992); see State v. Holmes, 388 So.2d 722, 727 (La.1980).
The record shows all prospective jurors on the first panel, including those who ultimately served on the jury which convicted Tart and sentenced him, were instructed during the trial judge's general introductory remarks, that their verdict would have to be based on the evidence they would hear at trial and the law which he would give them. S.R.Vol. I, p. 11. At the conclusion of the guilt phase of trial, the judge instructed:
I am simply going to instruct you as to all the law that you will need to know in order to reach a just and proper verdict. First, I will instruct you as to the general law applicable in all criminal prosecutions and then the particular law that is or may be applicable to this case. It is your duty to follow these instructions in reaching your verdict. Although you are the sole judges of the facts on the question of guilt or innocence, you have the duty to accept and apply the law as given by the Court.
R.Vol. 2, p. 449.
* * * * * *
You receive your evidence from the witnesses, but you receive instructions as to the law from the Court only. The attorneys in this trial, both for the State and for the defendant, may have referred to law or legal principles during the course of the trial. However, it is again emphasized that your instructions as to the law are given you by the Court, not by the attorneys or by the witnesses or by anyone else in attendance during this trial. It is your duty to accept the law as given you by the Court.... R.Vol. 2, p. 453.
Prior to the jury's deliberations in the penalty phase, the judge read the entire list of mitigating factors provided in La.C.Cr.P. art. 905.5, including the catch-all mitigating circumstance of Subsection (h). R.Vol. 3, p. 477. The judge then instructed:
However, in addition to those specifically provided mitigating circumstances, you must also consider any other relevant mitigating *140 circumstance. You are not limited only to those mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed. R.Vol. 3, p. 477.
The jurors, including the jurors culled from the first panel, were properly instructed that they were to receive the law from the judge alone, that they were to disregard any of the attorney's references to law or legal principles during the trial, that they could consider any of the statutory mitigating circumstances, and further that they could consider any relevant circumstances jurors felt should mitigate the penalty imposed. These assignments of error have no merit.

Assignment of Error # 7
The defendant argues the trial court erred in failing to require the prosecutor to give race-neutral reasons for peremptory challenges after defense counsel contested these challenges under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In this assignment, no specific prospective juror is named; however, the record shows two instances in which defense counsel raised a Batson objection to three African-American prospective jurors. R. Vol. I, p. 31-37.
Batson held an equal protection violation occurs when a party exercises peremptory challenges to exclude a prospective juror on the basis of race. A three-step analysis was adopted to determine whether prospective jurors' constitutional rights have been infringed by impermissible discriminatory practices.
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
State v. Green, 94-0887, p. 23 (La. 5/22/95), 655 So.2d 272, 287, citing Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991); see La. C.Cr.P. art. 795(C).[2]
The defendant is a young African-American man. The victims were elderly white persons. The defendant argues the race issue was extremely relevant in this case. The defendant had the burden of proving the first step of the analysis, whether a prima facie case of racial discrimination existed. To satisfy this burden, defense counsel could have offered any relevant facts on the question of the prosecutor's discriminatory intent.
Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
Green, p. 24; 655 So.2d at 288; State v. Collier, 553 So.2d 815, 819 (La.1989).
After the trial judge denied the state's cause challenge for prospective juror Raymond Williams, Jr., the prosecutor excused him peremptorily. The defense raised its first Batson challenge. The trial judge stated:
All right. And again, for the record, there are no prospective jurors, or jurors, in the courtroom. The motion by the Defense does not meet even the threshold requirement of ... The ruling of the Court is, when I said that it did not even meet the *141 threshold requirement of the article, I meant by that, is the ... there's no appearance at this point that the State is excluding prospective jurors peremptorily for reasons of race. On the contrary, in this case, the prospective juror, Mr. Williams, answered a number of questions and it is obvious to the Court that the State had several reasons other than race to peremptory challenge Mr. Williams. So the motion is denied. S.R.Vol. I, p. 256-257.
Prospective juror Yvonne Sparks was conditionally accepted as a juror; the following day, however, she was excused peremptorily by the state. The defense raised Batson objections to the peremptory challenges of Sparks and prospective juror Evertice Jones. The trial judge responded:
In the making and initial determination of whether there's a pattern of preemptory [sic] challenges by the State for racial purposes the Court, with respect not only to these perspective [sic] jurors preempted [sic] but every person who has been examined beginning Tuesday, the Court finds that those preemptory [sic] challenges were not for racial ... they were made for non-racial purposes. S.R.Vol. 3, p. 531.
Since Williams' peremptory strike was the first Batson challenge raised, there was no pattern of strikes by the prosecutor against African-American prospective jurors at that time. The record discloses no statements or actions by the prosecutor which support an inference that Williams, Sparks or Jones were challenged on the basis of race.
The record does not contain a breakdown of the racial composition of the venire or of the jury which was finally empaneled. The defense asserts the venire was composed of only five qualified African-Americans and that the state exercised three of its peremptory challenges within that group; other African-American venirepersons were removed by cause challenges. The state asserts it used eight of its twelve peremptory challenges; four of which were used to strike African-American venirepersons. The state also asserts the final composition of the jury was two African-American members and ten white members; the first alternate was African-American. The record shows that the prosecutor entered several "reverse-Batson" objections, i.e. that the defense was peremptorily striking several white venirepersons solely on the basis of race, which were also denied by the trial judge. R.Vol. I, p. 31-37.
Although the mere presence of African-American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing recommendation may be considered. In State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), a capital case, the prosecutor exercised all eight peremptory challenges against African-Americans; he accepted seven African-Americans prior to exhausting peremptory challenges. Of these seven, three were excused by the defense and four served on the jury. This Court held the defense failed to establish a prima facie case of purposeful discrimination.
In Collier, 553 So.2d at 819, the presence of two African-Americans on the defendant's jury did not necessarily defeat an inference of discrimination because the verdict only required a 10-2 vote. By contrast, in this capital case, the jury's finding had to be unanimous. After considering all relevant circumstances in this case, we conclude that defendant failed to establish a prima facie case of purposeful discrimination; it was unnecessary for the prosecutor to articulate race-neutral explanations for his strikes. The trial judge properly denied the Batson claims. This assignment of error has no merit.

Assignment of Error # 8
The defendant argues the trial judge erred in granting the state's cause challenge of prospective juror Linda Gulledge based on her expressed attitude toward the death penalty. The Witherspoon standard[3], as clarified by Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) is "whether the juror's views would `prevent *142 or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" See La. C.Cr.P. art. 798(2).
A review of Gulledge's entire voir dire colloquy shows extreme ambivalence as to her ability to consider a death sentence; she stated it would be almost impossible for her to sit on the jury and vote guilty, even if the state proved its case, knowing there might be a possibility of the death penalty. She also stated her attitude would seriously effect the way she viewed the state's case and the way she would deliberate. Although defense counsel pressed her to admit that she was not saying she could not do so, the record shows no true rehabilitation. S.R.Vol. 2, p. 320-321; 329-330. Gulledge was excused on the state's motion for cause. S.R.Vol. 2, p. 330, 345.
The trial judge did not err in excusing Gulledge for cause. The Wainwright standard does not require that a juror's bias be proved with unmistakable clarity. 469 U.S. at 424, 105 S.Ct. at 852. Gulledge's voir dire colloquy indicated her attitude toward the death penalty would prevent or substantially impair her from making an impartial decision at the guilt phase and from considering the death penalty at penalty phase. This assignment of error has no merit.

Assignment of Error # 9
The defendant argues the trial judge erred in allowing the prosecutor to strike three jurors, Ann Reeves, Vita Southern and Oather Dubose, for cause.
The defendant urges that Reeves' need for proof beyond a reasonable doubt, proof to an absolute certainty, related to her ability to impose the death penalty, and not her ability to convict. The defendant argues residual doubt can be used at the penalty stage to form the basis of a juror's decision to recommend a life sentence. The record shows Reeves was clear in her declaration that she would require a higher degree of certainty in the state's evidence than beyond a reasonable doubt. S.R.Vol. 3, p. 603-605, 609-610. From the context of the prosecutor's questioning of this panel, it is also clear the prosecutor was referring to the guilt phase of trial. S.R.Vol. 3, p. 602. The trial judge properly excused this prospective juror on the state's cause challenge as her voir dire responses showed she could not follow the law. La.C.Cr.P. art. 797(4).[4]
Southern's initial responses were confused; she vacillated whether she would hold the state to a higher burden in the guilt phase than the state is held to under the law. S.R.Vol. 2, p. 269-274, 283, 284. However, her voir dire responses also uncovered that she already had an opinion about the case which would affect her ability to sit as a fair juror. S.R.Vol. 2, p. 292-293. Her answers showed she would have trouble accepting circumstantial evidence. S.R.Vol. 2, p. 299. She also stated plainly that she would not be a fair juror. S.R.Vol. 2, p. 303. The trial judge properly excused this prospective juror on the state's cause challenge as her responses showed she was not impartial and she would have trouble accepting the state's circumstantial evidence. La.C.Cr.P. art. 797(2) and art. 798(3).[5]
Dubose's voir dire responses showed he would require the state to prove its case beyond all doubt, and rejected the law's burden of beyond a reasonable doubt. S.R. Vol. I, p. 185-188, 200-201. The trial judge properly *143 excused this prospective juror on the state's cause challenge as his voir dire responses showed he would be unable to follow the law. La.C.Cr.P. art. 797(4).
In a related claim, the defendant argues jurors selected from these panels may have been infected with the idea that "residual doubt" was not a proper consideration at sentencing. Any error in the prosecutor's voir dire questioning was cured by the trial judge's penalty phase instructions which informed the jurors they could consider any other relevant circumstances which they felt should mitigate the severity of the penalty to be imposed. R. Vol. 3, p. 477, see Assignment of Error # 6. This assignment of error has no merit.

Guilt Phase Issues

Assignment of Error # 12
The defendant argues the trial judge erred in failing to find statements he made to Reverend Leonard Posey were protected by the clergy/penitent privilege and were improperly admitted against him. According to Posey's testimony at a suppression hearing, he visited Tart at the request of community members who were concerned about Tart's treatment in jail. Posey was the local president of the N.A.A.C.P. and asked the police chief if he could speak to Tart about his treatment and any possible civil rights violations. Posey visited Tart in prison on September 17, 1989, accompanied by Tart's father. Tart told Posey he had committed the murders, that he had requested to speak to the police, and that his confession had in no way been obtained through threats or coercion. R. Vol. 4, p. 781. At trial, Posey testified Tart had confessed committing the murders and that his statement was not obtained through threats or coercion. R. Vol. 7, 1495-1496. At both the suppression hearing and at trial, the trial judge overruled the defense's objections to the admissibility of these statements on the basis of privilege.
Former LSA-R.S. 15:477 provided:
No clergyman is permitted, without the consent of the person making the communication, to disclose any communication made to him in confidence by one seeking his spiritual advice or consolation, or any information that he may have gotten by reason of such communication.[6]
State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), rejected the clergy/penitent privilege if the clergy member merely happened to be present during a suspect's admission or was not at hand to offer spiritual succor.
The record shows the trial judge did not err in admitting these statements. Although Posey's suppression testimony states he prayed with Tart, it also shows his main purpose in visiting Tart was to question him as to whether his civil rights were violated. Tart was not a member of Posey's congregation. Posey had never met Tart before. Posey did not visit at Tart's request. R. Vol. 4, p. 799. When he spoke to the police chief to obtain permission to visit Tart, Posey never mentioned he wanted to go for any religious reason. R.Vol. 4, p. 818. In an April 10, 1990 statement to an investigator, introduced at the suppression hearing, Posey clarified he was acting on behalf of the N.A.A.C.P. when he visited Tart and not as a pastor. See Ex. S-13, p. 3. The Berry holding is applicable here:
We are unable to find error in the trial court's factual appreciation that the primary purpose of this visit was not to seek spiritual advice or consolation, nor in its finding that, in the totality of circumstances presented ..., the communication was not made within the requisite nature of a confidential disclosure for religious purposes of a penitent to a clergyman seeking religious consolation.
Id., 324 So.2d at 829. This assignment of error has no merit.

Assignment of Error # 20
Police questioned 15-year old Kendale Leonard after Willie Jean Mason turned in two rings her son told her came from Leonard. Leonard gave a statement which included certain incriminating evidence against the defendant. The statement was used to *144 impeach Leonard's trial testimony. Tart argues the admission of Leonard's statement violated his own Fifth, Sixth, Eighth and Fourteenth Amendment rights.
This Court has previously held:
a third-party defendant does not have standing to contest the use of information gathered from a juvenile suspect. State v. Singleton, 376 So.2d 143, 145 (La.1979). More generally, `a person adversely affected by a confession unlawfully obtained from another has no standing to raise its illegality in court.' State v. Burdgess, 434 So.2d 1062, 1064 (La.1983).
State v. Byrd, 568 So.2d 554, 563 (La.1990). This assignment of error has no merit.

Assignment of Error # 15
The defendant argues the trial judge's failure to release to the defense all the information contained in the police department's "felony folder", referred to on the initial police report, was a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The record shows the initial report disclosed to the defense contained a notation that further information was contained in a "felony file". R. Vol. 2, p. 243. When the state refused to turn over this information, the defense took a writ to the court of appeal. The court of appeal granted the defense writ in part and ordered the trial court to conduct an in camera inspection of the "felony folder" to determine what information was discovered in the initial investigation. If necessary, the trial court was to order the investigating officer to file an amended initial report containing that information, as required by statute.[7]
Prior to one of the suppression hearings, the trial judge put Sgt. Freeman, who was in charge of the homicide investigation, under oath and conducted an in camera examination of his voluminous investigative file. R.Vol. 4, p. 610. After reviewing every piece of paper in the file for 15-20 minutes, the trial judge determined the only documents that constituted initial report information would include copies of the defendant's jail booking card, the defendant's fingerprints, a complaint report from Uradell Savage regarding a May 20, 1989 incident and defendant's arrest report for that date. R.Vol. 4, p. 611-614. The trial judge accounted for the size of the file by finding the folder contained the police log book, all the photographs pertaining to the case, transcriptions of witness statements, the tape of the defendant's confession, crime scene drawings, and paperwork relating to the return of recovered property. Most of this information had already been turned over to the defense. With the exception of witness statements, the trial judge found the defense could obtain the information through discovery. R.Vol. 4, 611-622.
The record reveals trial counsel, and apparently appellate counsel, misunderstood the scope of the court of appeal's order. Trial counsel continuously represented to the court that the defense was entitled to everything contained in the felony folder. R.Vol. 4, p. 609, 618, 622. The trial judge disagreed, finding his ruling complied with LSA-R.S. 44:3 A(4) and the court of appeal's order. R.Vol. 4, p. 623. The defense asserted it would take a writ from this ruling but the record contains no record of this. R.Vol. 4, p. 626. We agree that the trial court did *145 all it was ordered to do by the court of appeal.
The defense makes two assertions of unprovided Brady information: 1) whether or not Tart was initially arrested September 7, 1989 for murder, to support his argument that subsequent police questioning violated his right to counsel; and 2) whether Sneed had a drug problem, which could have been used for impeachment. Police testified they only had sufficient knowledge to arrest Tart for possession of stolen property on September 7, 1989. The facts of the case bear this out. It was only after further investigation and Tart's confessions that Tart was arrested for burglary and, later, for first degree murder. The record also shows defense counsel Tew questioned Sneed at trial regarding his drug conviction. R.Vol. 7, p. 1362-1363. The defense fails to demonstrate any Brady violation; this assignment of error has no merit.

Assignment of Error # 30
The defendant argues the trial court erred in admitting into evidence gruesome photographs which were highly prejudicial and which he alleges had no probative value, especially considering that a videotape of the crime scene was also introduced. The defendant specifically mentions the autopsy photographs were grotesque and extremely prejudicial.
State v. Maxie, 93-2158, p. 11 (La.4/10/95), 653 So.2d 526, 532 fn. 8, delineated the well-settled law regarding admission of crime scene photos:
It is well settled that a trial court's ruling with respect to the admissibility of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the evidence outweighs its probative value. It is equally well settled that postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location and placement of wounds, as well as to provide positive identification of the victim. State v. Martin, 93-0285, p. 14 (La. 10/17/94), 645 So.2d [190] at 198; State v. Watson, 449 So.2d 1321, 1326 (La.1984); State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983); State v. Brogdon, 426 So.2d 158, 169 (La.1983). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 558-559 (La.1986) (citations omitted).
The photographs in evidence are graphic but properly detail the victims' cause of death and location and placement of their many wounds. Their probative value far outweighs any prejudice. There was no error in admitting the crime scene photographs and the videotape. Since the crime scene encompassed more than one room, the state police crime scene technician testified the videotape was necessary to give the jury a full perspective. R.Vol. 8, p. 1512-1513. The coroner testified some photos were taken to look at the shape of the knife which inflicted the injuries. In addition, pictures were only taken of wounds most significant to the cause of death. R.Vol. 8, p. 1587. Some photographs showed defensive wounds, indicating the victims put up a fierce struggle. R.Vol. 8, p. 1588-1589.
As to the graphic autopsy photographs, they accurately depict the wounds inflicted. The coroner testified to two reasons for taking these additional photographs. First, to show the wounds inflicted. Second, to show only the clean wounds (surrounding blood can be confusing). R.Vol. 8, p. 1590. This assignment of error has no merit.

Assignment of Error # 28
The defendant argues his consent to a search of his house September 7, 1989, was not voluntary due to his mental limitations, and that the watch and jewelry seized at that time were therefore inadmissible. He claims more jewelry seized from Kendale Leonard on September 11, 1989, which was ultimately linked to the Quenans, was inadmissible. He claims the van keys, found after his September 13, 1989 confession, were tainted by the unconstitutional confession and were inadmissible.
The defense cites no facts on which to base its claim of Tart's mental limitations. However, it is unnecessary to further investigate *146 this claim since Tart's mother also consented to the search of her house on September 7, 1989. The defense does not assert that she was unable to authorize the search. Any evidence found was thus obtained after a consensual search and was admissible in evidence. Insofar as Tart's claim that jewelry seized from Kendale Leonard was tainted by Leonard's statement, that issue has been resolved against the defendant in Assignment of Error # 20. In addition, the record shows Leonard voluntarily surrendered the jewelry to police. Even though Leonard subsequently repudiated his statement at trial, he never stated he did not voluntarily turn over the jewelry. Because the defendant initiated contact with police on September 13, 1989, the confession rendered that date was constitutionally obtained; any evidence found subsequent to that confession was admissible. This assignment of error has no merit.

Assignment of Error # 16
The defendant argues that the prosecutor's improper tactics and arguments, singly and collectively, denied him a fair trial and sentencing. The defense first claims the state violated its obligations under Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), when it allowed Shelby Sneed, a key witness, to give perjured testimony to the effect that at the time he and defendant shared jail quarters in September, 1989, he had only been previously convicted of one felony. The defense also takes issue with Sneed's testimony that the charge for which he had been incarcerated with the defendant was still pending. The record shows Sneed's prior criminal record was introduced in evidence in connection with Sneed's testimony at the March, 1991 suppression hearing. R.Vol. 5, p. 946, 1019. This fact belies any implication that the state failed to disclose evidence of Sneed's prior convictions and relied on perjured testimony it allowed to go uncorrected. Defense counsel had the same opportunity to be aware of Sneed's record as the state did.
The defense also charges that the state knowingly allowed ADA Brumfield to testify falsely at the August, 1990, suppression hearing that Tart was not a suspect to the Quenan murders at the time of Tart's 72-hour hearing on his possession of stolen property charge. However, a transcript of that hearing shows Brumfield did tell the judge that Tart was a murder suspect. Defendant's Brief, Ex. 1. The record shows Brumfield prefaced his testimony by emphasizing how long ago the hearing had been and how many hundreds of 72-hour hearings he had attended since then. Brumfield also qualified his testimony by stating it was "to the best of my knowledge," indicating some degree of uncertainty. R.Vol. 4, p. 743, 746. The defense does not establish a knowing use of perjury.
The defense next argues the prosecutor's rebuttal closing argument in the penalty phase that Tart showed no remorse and made no apologies to Ms. Savage, whose car he stole and wrecked in the Bastrop cemetery in May, 1989, constituted a direct comment on Tart's failure to testify at the penalty phase. This claim is baseless. The record clearly shows the prosecutor was referring only to Tart's failure to apologize for his actions when he visited Mrs. Savage to entreat her not to pursue prosecution. R.Vol. 8, p. 1745.
The defense then complains that the prosecutor misstated the law during jury selection. This claimed error has been discussed extensively in Assignment of Error # 6 and was found meritless. The defense also claims the prosecutor misstated the law during closing argument at the guilt phase of trial by stating that intent "... is something we must infer from the circumstances." R.Vol. 8, p. 1667. Reading the complained-of comment in context, it appears that the prosecutor did not communicate a duty to infer the specific intent he was required to prove from the circumstances the evidence established, which would have been impermissible under Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Even if he did, this Court has held "a prosecutor's misstatements of the law during voir dire examination, or in his opening and closing remarks, do not require reversal of a defendant's conviction if the court properly charges the jury at the close of the case." State v. Cavazos, 610 So.2d 127, 128-129 *147 (La.1992). In his guilt-phase jury charge, after reading the definitions of both general and specific intent, the trial judge gave this instruction.
Intent is a condition of the mind, and rarely can be proved except circumstantially. One cannot see, feel, hear or touch intent. One's intent in the doing of any particular act is usually arrived at by a process of deduction and inference. It is usually proved by the sum total of acts or conduct joined with, or part of a transaction having as its goal the achievement of a particular purpose. You may infer that the defendant intended the natural and probable consequences of his acts.
R.Vol. 2, p. 454. The emphasized charge comes straight from the Louisiana Judges Criminal Bench Book, § 4.01. The court properly charged the jury that it "may infer" intent.
The defense next makes unspecified references to the state's closing argument in guilt phase and penalty phase which inflamed the jurors' emotions, misstated facts, or sought the death penalty based on victim impact. After reviewing the pages referenced by the defense, it is clear the prosecutor engaged in nothing more than proper closing argument based on the facts presented at trial.
Finally, the defense argues the prosecutor impermissibly urged the jury to return a death sentence based on the inadmissible evidence that people were afraid of Tart. The defense is referencing the prosecutor's argument regarding Tart's encounter with Mrs. Savage when he entreated her not to pursue prosecution for his burglary of her car keys and theft of her car. The prosecutor had asked Mrs. Savage if Tart's coming to her home had made her afraid, after which she replied, "Yes. Sort of." R.Vol. 8, p. 1715. Any effect the prosecutor may have attempted to exploit by arguing Mrs. Savage's fear of Tart was undercut by Mrs. Savage's testimony subsequent to that exchange in which she stated she invited Tart into her home and held a 45 minute Bible reading with him. R.Vol. 8, p. 1715-1716. The jury was well aware of this testimony. After review of the entire record in this case, it is apparent the jury did not sentence Tart to death based on this prosecution argument. This assignment of error has no merit.

Assignment of Error # 18
The defendant argues the guilt phase jury charge was constitutionally inadequate. Specifically, the defendant claims the jurors should have been instructed that they could give no weight to an involuntary statement, in reference to Tart's murder confession. The defense claims the jury should also have been instructed how they should consider the testimony of an informer, in keeping with its allegation that Shelby Sneed was one. The trial judge instructed the jurors:
If you find that defendant made a statement, you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded a statement made by a defendant, you should consider all the circumstances under which the statement was made. In making that determination, you should determine whether the statement was made freely and voluntarily, without the influence of fear, duress, threats, intimidation, inducement, or promises.
R.Vol. 2, p. 452. This charge is taken directly from the Louisiana Judges' Criminal Bench Book, § 5.01. Nothing the defense sets forth imposes a duty to give further instructions on this issue; nothing the defendant cites compels this Court to find the jury charge legally inadequate. The instructions given by the trial judge on this issue were sufficient to guide the jury in its deliberations without further elaboration or particularization.
The trial judge further instructed:
In deliberating upon the facts, you jurors alone shall determine the weight and credibility of the evidence as well as the credibility of the witnesses as you are impressed with their truthfulness or lack of truthfulness. In considering the credibility of the witnesses, you may take into account the manner or demeanor of the witness on the stand, the probability of his or her statement, the interest he or she may have in the case and every other circumstance surrounding the giving of his *148 or her testimony which may aid you in weighing his or her statements.
If you believe that any witness in the case, either for the State or for the defense, has willfully and deliberately testified falsely to any material fact, then I charge you that you are justified in disregarding the entire testimony of such a witness, if there is one, as proving nothing and as unworthy of belief. To state this rule another way, you as jurors have the right to accept as true, or reject as untrue, the testimony of any witness.
R.Vol. 2, p. 451. These instructions adequately guided the jury's determination of all the witnesses' testimony, including that of Sneed.
The defendant argues that because jurors could have differed in their views of what intent the state proved (whether intent to kill or intent to do great bodily harm) or what felony Tart was perpetrating at the time of the murders, there was a possibility of a non-unanimous verdict. La.C.Cr.P. art. 480 expressly approves conjunctive charging.
The defendant argues the trial court should not have given an instruction attempting to define reasonable doubt. A review of the charge shows it used the same wording approved in State v. Smith, 91-0749 (La. 5/23/94), 637 So.2d 398, cert. denied, ___ U.S. ___, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994). The defendant argues the trial court's instruction regarding intent was an unconstitutional burden-shifting charge. This argument was found without merit in Assignment of Error # 16. The defendant also complains of the charge of the lesser included offense of second degree murder. The record shows the charge given was the statutory definition of LSA-R.S. 14:30.1. This assignment of error has no merit.

Penalty Phase Issues

Assignment of Error # 10
The defendant argues trial counsel was ineffective at the penalty phase for failing to present mitigating evidence and for failing to correct the prosecution's voir dire misstatements of law on mental health mitigation. In part, this argument reurges argument presented in Assignment of Error # 6, and to that extent, it is found to be without merit based on the earlier discussion.
"[A] defendant at the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney who acts as a diligent, conscientious advocate for his life." State v. Sanders, 93-0001, p. 25 (La. 11/30/94); 648 So.2d 1272, 1291. In reviewing this claim of penalty phase ineffectiveness, this Court:
must determine whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Unless defendant shows both a deficient performance and prejudice, the court cannot find that his death sentence resulted from a breakdown of the adversarial process which rendered the result unreliable.
Sanders, pp. 25-26; 648 So.2d at 1291.
While acknowledging that trial counsel presented penalty phase evidence from various lay witnesses regarding Tart's learning disabilities, the apparent effect they had on his self-esteem, and the frustration he experienced as a result, appellate counsel urges that trial counsel should have produced more evidence on these issues without specifying where this information should come from.
The only concrete example of evidence given by appellate counsel which should have been admitted are the Bastrop Mental Health Clinic records previously discussed in Assignments of Error # 17, 25, 26 and 3, 4, 27 and 29. Appellate counsel asserts there could have been no strategy decision involved in foregoing this evidence. Appellate counsel characterizes the evidence as an August 25, 1989, voluntary visit prior to the murders which catalogued defendant's school difficulties, forgetfulness and thoughts that he was crazy. The report reflects that two weeks before the Quenan murders Tart told the nurse therapist he was under great pressure and had thoughts of killing himself and others. He further detailed an abusive childhood during which he was starved and emotionally deprived. The defense asserts the *149 jury may have wished to know about the pressures and feelings Tart described just prior to the crime.
The Sentence Investigation Report prepared by the Ouachita Parish Investigator relates that Tart told the investigator his stepmother had sent him to the mental health clinic to act crazy "so that a check could be received for the household." In light of this information, any suggestion that there could be no strategic excuse for failure to introduce these records is meritless. The record also shows that trial counsel had Tart examined by a psychiatrist in the hopes of developing evidence for an insanity plea or for mitigation evidence, but that the report was never introduced and those hopes were never realized. Far from suggesting trial counsel was ineffective for failing to develop mental health mitigation evidence, the record shows trial counsel attempted to do so, but such evidence was not available. This conclusion is supported by the fact that appellate counsel offers nothing as to what evidence should have been discovered or admitted. Appellate counsel fails to show that trial counsel's performance was deficient. This assignment of error has no merit.

Assignment of Error # 21
The defendant argues the introduction of "victim impact" evidence at the penalty phase was reversible error and violated Tart's right to humane treatment, due process and a reliable sentencing determination. The record shows the state presented brief testimony from two of the victims' four adult children on the impact of the victims' death. In penalty phase hearings, "some evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender." State v. Bernard, 608 So.2d 966, 972 (La.1992). The victims' children's testimony provided "a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors" in keeping with the limitations expressed in Bernard. Id., 608 So.2d at 971. This assignment of error has no merit.

Assignment of Error # 19
The defendant argues the penalty phase jury instructions were constitutionally inadequate. First, the defendant complains the trial judge neither defined nor explained mitigation, thus giving no adequate guidance to how the jurors should consider mitigation evidence. The defendant further charges that the instruction gave the jurors the erroneous impression that a mitigating factor had to be found unanimously.
The record shows the trial judge read the list of statutory mitigating circumstances to the jury which includes as a definition "any other relevant mitigating evidence." La. C.Cr.P. art. 905.5(h). The trial judge went on to instruct:
However, in addition to those specifically provided mitigating circumstances, you must also consider any other relevant mitigating circumstance. You are not limited only to those mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed.
R.Vol. 3, p. 477. The trial judge gave the jurors a copy of the statutory mitigating factors before they deliberated. In State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), the trial judge did likewise. In response to the argument that the trial judge failed to explain statutory mitigating circumstances and their function in the jurors' deliberations, this Court disapproved any further instruction. "Any further attempt to define or expand upon statutory mitigating circumstances may only lead to juror confusion and further efforts to define the definitions." Id., 441 So.2d at 716. A fair reading of the instructions does not suggest a requirement of unanimity in consideration of a mitigating factor.
The defendant next argues the jury was never informed of their unfettered life option; i.e. that even if they found an aggravating circumstance and no mitigating circumstances they could still return a life sentence. The record belies this claim. The trial judge *150 instructed "[t]he finding of an aggravating circumstance does not mean that you must impose the death penalty." R.Vol. 3, p. 476-477.
The defendant asserts the trial court erred in instructing the jury that its sentencing verdict was merely a recommendation, which lessened the jury's feeling of ultimate responsibility for its sentence. The record belies this claim. At the very beginning of penalty phase jury instructions, the trial judge told jurors "[y]ou must now decide whether the defendant should be sentenced to death or to life imprisonment without benefit of probation, parole or suspension of sentence" and "[i]n reaching your decision regarding the sentence to be imposed ...". R.Vol. 3, p. 476. Such statements were made throughout the instruction: "[b]efore you decide that a sentence of death should be imposed..."; "[i]n the event you unanimously decide the death penalty should be imposed..."; "[i]f the jury decides that a life sentence... should be imposed ...". R.Vol. 3, p. 476, 478. The verdict form states:
Having found the below listed statutory aggravating circumstance or circumstances and, after consideration of the mitigating circumstances offered, the jury unanimously determines that the defendant be sentenced to death.
R.Vol. 3, p. 480 (emphasis supplied). Further, throughout voir dire, jurors were repeatedly told that if the defendant were found guilty of first degree murder, the jury would decide whether the death sentence would be imposed. No juror could have failed to appreciate the nature and gravity of the jury's death penalty decision. See State v. Lindsey, 543 So.2d 886, 903-904 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990).
Finally, the defendant asserts the trial court failed to instruct the jurors that they should draw no negative inferences from Tart's failure to testify at the penalty phase. The defense did not request such an instruction. The trial judge did instruct "[i]n addition to the evidence presented at this sentencing hearing, in deciding the sentence to be imposed, you may consider evidence presented during the guilt determination trial." R.Vol. 8, p. 1747. In the guilt phase, the jurors had been instructed:
A defendant is permitted by law to testify in his own behalf, but not required to do so.... No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant did not testify, call witnesses or produce evidence.
R.Vol. 2, p. 451-452. The jury was allowed to consider Tart's guilt phase testimony in its determination of sentence; thus, it was previously instructed that no inference could be drawn from the defendant's failure to testify. This assignment of error has no merit.

Assignment of Error # 32
The defendant argues the trial judge erred in explaining the error of the first sentencing verdict rendered and sending the jury back to deliberate after instruction. The defendant claims that in sending the jury back to attempt to return a proper verdict, the trial judge violated the principles underlying the prohibition against double jeopardy and cruel and excessive punishment.
The record shows that after the initial sentencing verdict was reached, the clerk read the verdict in open court. The jury was polled to see if this was their verdict and the panel responded "yes." The trial judge then asked to see the verdict form and called the attorneys to a bench conference. R.Vol. 8, p. 1749-1750. After a bench conference, the trial judge addressed these remarks to the jury:
Ladies and Gentlemen, in reviewing your verdict form it says, A) the offender was engaged in the perpetration or attempted perpetration of aggravated burglary, armed robbery, first degree robbery or simple burglary. Simple burglary is not in accordance with the list of statutory aggravating circumstances. I'm going to send you back into the jury room to consider that fact and to change the verdict form should you see fit. The simple burglary is not one of the aggravating offense, simple robbery is and that's how it's listed on there.
*151 R.Vol. 8, p. 1751. After more deliberation, the jury was escorted back to the courtroom and the foreman indicated the jury had reached a sentencing verdict. The clerk published the amended verdict in open court:
Verdict: Having found the below listed statutory aggravating circumstance or circumstances and after consideration of the mitigating circumstances offered, the jury unanimously determines that the defendant be sentenced to death. Aggravating circumstance or circumstances found: A) the offender was engaged in the perpetration or attempted perpetration of aggravated burglary, armed robbery, first degree robbery or simple robbery. B) the offender knowingly created a risk of death or great bodily harm to more than one person. Signed, Dewayne Foster, Foreperson. Date, 11/19/91.
R.Vol. 8, p. 1752. The jury was asked if this was their verdict and they responded "yes." The defense requested that the jury be polled and a written poll of each juror was accomplished. The court examined the results of the poll and found it unanimous. The jury was then dismissed. R.Vol. 8, p. 1752-1753.
Although there is nothing in the criminal procedure rules for capital sentencing regarding the situation here where the jury determination is as to sentence, La.C.Cr.P. art. 905 et seq., analogy may be made to La.C.Cr.P. art. 813 and non-capital criminal trials where the jury returns the verdict as to guilt. La.C.Cr.P. art. 813 provides:
If the court finds that the verdict is incorrect in form or is not responsive to the indictment, it shall refuse to receive it, and shall remand the jury with the necessary oral instructions. In such a case the court shall read the verdict, and record the reasons for refusal.
In situations where a jury has returned with an improper or unresponsive verdict and the trial judge has sent the jury back with further instructions, this Court has found no error. Examples are State v. Fornea, 242 La. 978, 140 So.2d 381 (1962), where the jury has been formally discharged, but has not disbanded, and State v. Owens, 193 La. 505, 190 So. 660 (1939), where the jury had to be sent back three times to reach a proper verdict. The judge "may inform the jury-without necessarily suggesting what should be the verdict-why it is that the verdict is incomplete or not responsive to the charge." Owens, 190 So. at 664, citing State v. Keasley, 50 La.Ann. 761, 764, 23 So. 900, 902 (1898).
There was no attempt on the part of the trial judge to influence the verdict. He only pointed out the proper statutory language and sent the jury back to deliberate. "[T]he court has a right to direct the jury to reconsider their verdict before it is recorded, and it is its duty to do so when satisfied there has been a palpable mistake." Owens, 190 So. at 664. Since the trial court did not accept the initial sentencing verdict, there was no double jeopardy violation. The trial judge did not err in allowing the jury an opportunity to correct its improper verdict. This assignment of error has no merit.

Other Issues

Assignment of Error # 11
The defendant argues that, despite a March 27, 1990 motion to have all aspects of the trial recorded and transcribed, there was incomplete recordation and transcription, resulting in a deprivation of his constitutional right to review based on a complete transcript. Appellate counsel argues numerous hearings, important bench conferences, and aspects of jury selection were not recorded or transcribed. First, counsel complains about the record's lack of transcript of a bench conference between ADA Brumfield and Judge Joyce at Tart's September 11, 1989 72-hour hearing. Obviously, this bench conference predated the defense's motion. There was no prejudice to Tart's appeal rights, however, because appellate counsel did acquire a transcript of this bench conference; this Court ordered it made a part of the record on appeal. Motion to Enlarge the Record, 10/19/95.
Appellate counsel next complains of an unrecorded pretrial bench conference at which the state sought the court's ruling on whether a portion of Sneed's statement was exculpatory and had to be disclosed to the defense. *152 Defense counsel was present at the bench conference and lodged no objection after the court's on-record ruling. R.Vol. 5, p. 948-949. The defense ties this record omission regarding Sneed's statement with the Court's ability to review the admission of Tart's murder confession. This record omission did not prevent this Court's review of Assignment of Error # 3.
The defense's next specific reference involves an in chambers conference prior to an October 4, 1990 motion hearing. The conference was to identify the outstanding motions. The trial judge then made a record of the outstanding motions identified in the chambers conference and set hearing dates. There is no indication that any evidence was adduced or that any argument of counsel was presented relative to the merits of any issue in the case. In fact, for one of the specific instances alleged by the defense, the trial judge called for submission of authorities from the parties to precede a ruling on the motion. R.Vol. 5, p. 842-852.
The defense complains the transcript of voir dire failed to include the strikes of each side, the reasons for striking for cause, and the race of each prospective juror. These omissions did not prevent this Court from fully reviewing the defense's assignments of error regarding jury selection. See Assignments of Error # 1, 6, 7, 8, 9.
The next specific reference is the failure to transcribe the tape of Tart's confession which the jury heard. The jury heard the tape because of the pretrial transcript inaccuracies. R.Vol. 7, p. 1471-1472. Since the tape is among the appellate record exhibits, see S-85, this omission is meritless.
The defense also complains about the omission of the September 11, 1989 72-hour hearing transcript and Judge Joyce's deposition relating to that hearing. This transcript and deposition are now a part of the record following this Court's granting, in part, the defendant's Motion to Enlarge the Record.
State v. Johnson, 438 So.2d 1091, 1104 (La.1983), relying on State v. Ford, 338 So.2d 107, 110 (La.1976), held:
A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction.
The defense complaints are immaterial to this Court's review of the record. This assignment of error has no merit.

Assignment of Error # 22
The defendant argues the Uniform Capital Sentence Report (UCSR) and Sentence Investigation Report (SIR) are misleading, inaccurate and cannot serve as a basis for this Court's proportionality review. The UCSR was completed and filed by the trial judge in conformity with La.C.Cr.P. art. 905.9 and Rule 905.9.1 § 3(a) pursuant to Supreme Court Rule 28. The SIR was completed by a Ouachita Parish investigator. These documents, which inquire into the defendant's prior delinquent and criminal activity, family situation and background, education, economic and employment status, and any other relevant matters concerning the defendant, are submitted to aid this Court's mandatory review to determine whether the death sentence imposed is excessive. Both the state and the defense are afforded an opportunity to oppose the factual contents of these reports; if there is sufficient grounds, the trial court conducts a contradictory hearing to resolve any substantial factual issues. Rule 905.9.1 § 3(c). This Court has the discretion to remand for further development of facts relating to whether the sentence is excessive. Rule 905.9.1 § 5.
The defense points to errors and omissions in the UCSR and SIR. The defense further argues the two reports are biased and slanted. A review of these documents reveals these arguments are without merit; where omissions are found, they are not compelling enough for this Court to remand for further development.
The defense complains the UCSR does not state the date of the defendant's mother's death. The report indicates the date was unknown. The defense does not point out why this fact is significant to this Court's sentence review.
*153 The defense complains the SIR erroneously states the defendant was one year old when his mother died. The defense is wrong; the report states Tart was one year old when his mother left him and her other children to move to California.
The defense complains no I.Q. is listed although psychiatric evaluation was performed; the defense also complains the psychiatric evaluation is not attached for this Court's review. This is an omission on the UCSR; however, testimony of Tart's learning disabilities is in the trial record and further information regarding Tart's school difficulties are detailed in the SIR. In addition, the Court may refer to Tart's trial testimony to review whether he appeared to comprehend the proceedings. The state's brief asserts Tart's I.Q. is 82 and that this information was made available to Tart's trial counsel through school records. State's Supplemental Brief, p. 4. Defense counsel has not contested these allegations.
The defense complains the trial judge did not specify that the defendant was socially promoted from second, third and fifth grades in the "Education" section of the UCSR. This information is contained, however, in the SIR. Since the Court will review both reports, the defendant is not prejudiced.
The defense complains the trial judge found no special considerations needed to be made for the defendant for any mental condition considering the penalty phase testimony regarding his learning disabilities, his turbulent and chaotic home life, and the report of the Bastrop Mental Health Clinic. Since this Court can review this record evidence, it is not apparent how the lack of these items in the UCSR or SIR will impair the Court's sentence review.
The defense claims the trial judge was biased toward the defendant because he: 1) indicated the defendant had a record of prior convictions when he only had one prior conviction; 2) indicated the victims were physically harmed or tortured when the state did not argue the crimes were "especially heinous" under La.C.Cr.P. art. 905.4(A)(7); 3) indicated there was no evidence of drug or alcohol use when the defendant's confession showed he consumed alcohol the night the crimes were committed; and 4) indicated there was no relevant mitigating circumstance not argued to the jury, indicating the Bastrop Mental Health Clinic report and Tart's poor school record should have been presented. As to 1), the trial judge properly completed the form. As to 2), the evidence presented at trial more than supports the trial judge's indication. As to 3), this Court has the defendant's confession to review, so will not be misled by the trial judge's error in completing the UCSR. As to 4), the jury was presented evidence of Tart's poor school performance and his learning disabilities; it is not certain the failure to introduce the mental health clinic record was not a wise strategic decision. None of these complaints show bias.
The defense complains certain mitigating evidence was not presented to the jury. This issue was discussed in Assignment of Error # 10 and is not relevant to a discussion of the sufficiency of the UCSR and SIR.
The defense complains of the hearsay statement of the Bastrop Mental Health Clinic's nurse therapist that she thought the defendant was lying when he related his psychological problems on August 25, 1989. The defense fails to comment on Tart's own statement that he was lying at that time.
The defense points out that the SIR states Tart refused to make a statement and then attributes several comments to him. The SIR states Tart chose not to make a statement "relative to this offense". The fact that Tart did not wish to make a statement regarding the Quenan homicides does not preclude him participating in interviews for the SIR.
The defense complains the SIR is slanted and points out that no "real" social history was taken and that the investigator did not find out when Tart's mother died or whether she abused Tart. The defense also complains that the SIR contains the opinions of law enforcement officers and the victims' children.
The SIR shows the investigator spoke to Tart, his father, and two of his aunts. The *154 defense does not state how this social history is not "real." The Court is not hindered in its review of sentence excessiveness by lack of information as to the date Tart's mother died. The investigator did determine there was some evidence that Tart's mother physically abused him prior to her leaving when Tart was one year old. Since the SIR is only presented to the Court to aid its review of sentence excessiveness, and not to jurors or lay personnel who might not objectively review this evidence, any statements of law enforcement officers or the victims' children will not be improperly relied upon.
Finding none of the defense allegations of error or omission merit further development for this Court's review of sentence excessiveness, the Court need not remand for a hearing. Compare State v. Smith, 400 So.2d 587, 593-594 (La.1981) (where SIR revealed discrepancies on two fact issues between trial testimony and statements obtained for SIR). This assignment of error has no merit.

Assignments of Error # 23 and 31
The defendant argues that the errors in this case, even if they do not singly require reversal, cumulatively mandate reversal. The defendant also argues there were several due process errors which cumulatively deprived him of a fair trial.
This Court has carefully examined each of the errors alleged by defendant and found them to be without merit. The Court has also read through the record for unargued error and found none. As the Court stated in another first degree murder case, State v. Sheppard, 350 So.2d 615, 651 (La.1977), "[w]e are unwilling to say that the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction [or sentence]." A defendant is not entitled to a perfect trial, only a fair one. Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) (citation omitted); State v. Martin, 550 So.2d 568 (La.1989). This Court's reading of the record convinces us that the defendant received a constitutionally fair trial. These assignments of error have no merit.
LEMMON, Justice, dissenting.
The crucial question is whether prospective juror Vanessa Rice was "Witherspoon excludable" under La.Code Crim.Proc. art. 789(B). If she was not, then the trial judge erroneously maintained a challenge for cause based on Witherspoon grounds. Whenever such an error occurs, Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), requires that the penalty phase of the capital case must be retried.
Prospective juror Rice stated that she had mixed feelings about the death penalty because it was sometimes imposed upon defendants whom do not deserve it and at other times not imposed upon defendants who do deserve it. She gave as an example a defendant who was mentally ill, and further gave the specific example of Winthrop Eaton, a defendant who was sentenced to death and who (in her personal knowledge) was mentally ill. The prosecutor then asked lengthy and confusing questions, some of which misstated the law by stating that only an extreme mental or emotional condition can constitute a mitigating circumstance which may legally be considered by the jury. The defense attorney added to the confusion by agreeing with the prosecutor's misstatement of the law regarding a mental or emotional condition as a mitigating circumstance.
Nevertheless, irrespective of the confusion and the misstatements of law, the prosecutor never did establish that Rice would vote against the death penalty whenever there was evidence by expert witnesses that the defendant was under the influence of an extreme mental or emotional condition. Admittedly, Rice did answer "yes" to an extremely lengthy and confusing question (containing misstatements of law) that ended "[s]o if there's some evidence of emotional disturbance, that would say to you, that's enough." However, she affirmatively stated near the end of the questioning of the panel that she could follow the law, as given by the trial judge, regarding mental and emotional conditions and concluded by stating that she "would follow the law in that regard [to a mental or emotional condition as a mitigating circumstance]."
*155 Therefore, the prosecutor failed to establish that Rice's "attitude toward the death penalty would prevent or substantially impair [her] from making an impartial decision as a juror in accordance with [her] instructions and [her] oath." La.Code Crim.Proc. art. 789(2)(b). The prosecutor may have established that Rice might lean toward a life sentence when the evidence showed the defendant had a mental or emotional condition, although she would follow the law given by the judge on the point, but establishment of a philosophical leaning that would yield to following the law would only be the basis for a peremptory challenge by the prosecutor, and would not prove that the prospective juror was "Witherspoon excludable."
I would reverse the death penalty and remand for a new penalty hearing before a properly constituted jury.
CALOGERO, Chief Justice, dissenting.
I dissent for the reasons assigned in dissent by Justice Lemmon.
JOHNSON, Justice, dissenting.
I respectfully dissent from the conclusions reached by the majority in allowing both the conviction and penalty to stand in this matter. I agree with the reasons assigned by Justice Lemmon which attack the sentence phase based on relator's argument stated in Assignment of Error No. 1. Also, the evidence shows that relator's Assignment of Error No. 5 has merit because it was reversible error to admit into evidence unadjudicated prior acts during the penalty phase. In terms of the conviction, the record reveals that Assignments of Error Nos. 3, 4 & 27 all have merit and were grounds upon which the conviction should have been set aside and a new trial ordered.
The bodies of Mr. and Mrs. Quenan were discovered by their neighbors in their Bastrop, Louisiana home in the early morning hours of September 7, 1989. Their daughter had called neighbors and asked them to check on her parents. Sergeant Gary Freeman and Sergeant Sherman Burrell of the Bastrop Police Department were assigned to the investigation. Early on, the officers learned that Cleveland Holmes had done some yard work for the Quenans and that Willie Lee Tart had worked for him. That same day, they interviewed a high school student, Willie Smith who told them that Tart was in possession of several pieces of expensive jewelry from a burglary. Tart was taken into custody at about 12:00 noon on September 7th, and his residence was searched. This search turned up jewelry from two residences that had been burglarized (the Berry and Robertson residences).
According to the arrest register dated September 7, 1989, the offenses suspected or charged were two (2) counts of first degree murder, possession of stolen property and three (3) counts of simple burglary of an inhabited dwelling. (See Attachment A). When questioned on September 7th, Tart invoked his right to counsel and signed one of several waiver of rights forms.
On September 11th and 14th, a seventy-two hour hearing was held before the duty judge, the Honorable John R. Joyce of the Fourth Judicial District as mandated by LSA C.Cr.P. article 230.1. At his deposition, Judge Joyce testified that the Quenan murders were a "hot item" in Morehouse Parish, and that he had had conversations with law enforcement officers concerning the murders of this couple. He further testified that on September 11th, he knew that Tart was a suspect in more than just a case involving possession of stolen property. According to Judge Joyce, he was aware that Tart was a suspect in the murders, but on September 11th, he was not formally charged with the murders but only with illegal possession of stolen property, so he fixed Tart's bond at $5,000.00. He did not appoint counsel to represent Tart, nor did he follow his usual practice of immediately referring the defendant to the Indigent Defender Board where the accused has not made bond or is unable to make bond.
The State takes the position that Tart's right to counsel applied only to the possession charges and that they were free to continue to interrogate Tart as to the murder charges. Some time on the evening of September 11th, or in the early morning hours of September 12th, Tart was placed in a cell *156 adjacent to Shelby "Cookie" Sneed. Sneed had previously functioned as a paid informant for both of the assigned officers, Sergeants Burrell and Freeman who were investigating these murders.
According to Sergeant Freeman, Tart was moved from his minimum security cell to the maximum security area of the Bastrop City Jail because he was now a suspect in the murder investigation and this was a more secure area of the jail. Sneed was able to engage Tart in "conversations" and ultimately convinced him to give the incriminating statement on September 13, 1989. By this date, Tart had been incarcerated six (6) days, had requested the assistance of counsel several times without success, and was in a coercive environment where psychological pressures were applied to convince him to talk about these murders.
The right to assistance of counsel is contained in the Sixth Amendment of the Constitution of the United States and is one of the inalienable rights guaranteed to all citizens. It is my opinion that where a citizen's rights under the constitution are violated, any evidence obtained because of the infraction should be suppressed. In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) the court held "that a suspect who has `expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" This rule was expanded to specifically exclude evidence obtained through interrogation of a suspect about an offense that is unrelated to the subject of their initial interrogation. See Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) where a defendant was arrested and interrogated for one burglary, invoked his right to counsel, was subsequently questioned about a different burglary, and gave an incriminating statement concerning the different burglary. The Supreme Court allowed the suppression of the incriminating statement to stand because it makes no difference whether the defendant is re-interrogated about the same offense or an unrelated offense.
I believe that Sneed should be viewed in the same light as the government informant in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Sneed was strategically placed to elicit information, and in fact left his cell several times to report his progress to Burrell and Freeman. By about 6:00 P.M. on September 13th, Sneed told the jailers that Tart was ready to talk with the detectives. Sneed went along with them to the interrogating room. When asked why he went along, Sneed replied: "When they came to get him out of the cell, he was frightened, you know. He was frightened. He was really ... he was really scared, you know. I don't know what he was frightened about or what ever, you know, but he started to crying and stuff ..." (Tr. p. 933).
Applying the law of these cases to this matter, it is clear that Tart's Sixth Amendment Right to Assistance of Counsel was craftily violated by law enforcement when a hired informant was strategically placed in an area to knowingly and willfully solicit information. Therefore, any evidence obtained, specifically the coerced confessions, should never have been allowed into evidence. Because the death penalty is an absolute and final resolution, this court should set aside both phases of this trial and remand the case for a new trial.
*157 
NOTES
[1] Judge Burrell J. Carter, Court of Appeal, First Circuit, sitting by assignment in the vacancy created by the resignation of Dennis, J.

Carter, J. Ad Hoc, not on panel. Rule IV, § 3.
[2] Citations in the opinion and the appendix are designated "S.R." for the Supplemental Record and "R." for the Record, followed by the appropriate volume and page numbers.
[3] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) held a death sentence may not be carried out if the jury that imposed or recommended that sentence was chosen by excluding prospective jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. 391 U.S. at 522, 88 S.Ct. at 1777. Under Witherspoon, jurors could be excluded by the state for cause if they made it clear they would automatically vote against imposition of capital punishment at sentencing or that their feelings about the death penalty would prevent them from making an impartial decision regarding the defendant's guilt. Id., 391 U.S. at 522 fn. 21, 88 S.Ct. at 1777 fn. 21. Witherspoon was clarified in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The proper standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath." Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852 (internal citations omitted). Both the Witherspoon and Wainwright standards for state cause challenges were codified in La.C.Cr.P. art. 798(2).
[4] Tart's confession to the Quenan burglary was admitted at the guilt phase of his trial; his confession to the Berry and Robertson burglaries was admitted at the penalty phase of his trial.
[5] See R.Vol. 4, p. 639, 640, 646-647, 657, 697, 699, 720, 759; R. Vol. 5, p. 877, 896, 897, 989.
[6] See R. Vol. 7, p. 1412, 1439-1440, 1444-1446, 1453.
[7] La. Const. art. I, § 13 provides:

When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment. The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents.
[8] Carter overruled Hattaway in part but left intact, because it was not necessary to its decision, Hattaway's pronouncement that the right to counsel provided by La. Const. art. I, § 13 (and thus the Sixth Amendment) attached no later than the initial court appearance or first judicial hearing.
[9] Jackson also limited evidence of prior convictions to felonies and limited evidence in support to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime. The Court specifically prohibited evidence of the original charge when the conviction was for a lesser offense. Jackson, 608 So.2d at 954. In Sanders, evidence of the original charge had been admitted.
[1] La.C.Cr.P. art. 831, in pertinent part provides:

A. Except as may be provided by local rules of court in accordance with C.Cr.P. Art. 551, a defendant charged with a felony shall be present:
(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself.
[2] La.C.Cr.P. art. 795(C) provides:

No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
[3] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[4] La.C.Cr.P. art. 797(4) provides:

The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(4) The juror will not accept the law as given to him by the court.
[5] La.C.Cr.P. at. 797(2) provides:

The state or the defendant may challenge a juror for cause on the ground that:
* * * * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
La.C.Cr.P. art. 798(3) provides:
It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
* * * * * *
(3) The juror would not convict upon circumstantial evidence.
[6] A similar privilege is now provided in La.C.E. art. 511, effective January 1, 1993.
[7] The 2nd Circuit Court of Appeal held:

WRIT GRANTED IN PART; STAY GRANTED.
The intent of LSA-R.S. 44:3A(4) is to declare that the entire initial report of the investigation following a complaint constitutes a public record subject to discovery. This intent may not be defeated by including only selective information in the initial report and by placing the remainder of the information obtained by the initial investigation in a separate supplemental report. The initial report should include all information obtained in the initial investigation of the complaint, especially when the initial investigation following the complaint results in the requesting party's arrest.
Accordingly, this matter is remanded to the trial court and, prior to the hearing on the motion to suppress, it is instructed to conduct an in camera inspection of the "felony folder" to determine what information was discovered in the initial investigation and, if necessary, to order the investigating officer to file an amended initial report containing that information, as required by the statute. State v. McEwen, 504 So.2d 817 (La.1987).
R.Vol. 2, p. 310.